# United States Court of Appeals
## For the First Circuit

No. 00-2332

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICIA A. TEETER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya and Lynch, Circuit Judges.

Peter E. Rodway and Rodway & Horodyski on brief for appellant.

Jay P. McCloskey, United States Attorney, and Margaret D. McGaughey, Assistant United States Attorney, on brief for appellee.

July 23, 2001

**SELYA, Circuit Judge.** In this sentencing appeal, we address for the first time two important questions. The principal question concerns the validity of an advance waiver of appellate rights contained in a plea agreement.[1] Although we conclude that such waivers are not forbidden, we refuse to give effect to the waiver in this case because the record offers no sufficient assurance that it was tendered knowingly and voluntarily.

Despite winning this battle, the appellant ultimately loses the war. Entertaining her appeal, we reach the second main question — one that involves the effect to be given to a stipulation, contained in a plea agreement, as to how a specific sentencing issue should be resolved. On the facts of this case, we hold that the district court did not commit reversible error in accepting and acting upon a stipulated cross-reference within the sentencing guidelines and, concomitantly, employing the stipulated base offense level (BOL) produced by the use of that cross-reference.

The appellant also raises other, more pedestrian issues. As to those issues, we hold that the district court's

---

[1]We have alluded to this issue in earlier cases, e.g., United States v. Ramirez, 252 F.3d 516, ___ (1st Cir. 2001) [No. 00-2274, slip op. at 3]; United States v. Hines, 196 F.3d 270, 272 (1st Cir. 1999); United States v. Springer, 28 F.3d 236, 237 (1st Cir. 1994), but we have yet to resolve it.

refusal to depart downward from the guideline sentencing range (GSR) did not constitute an appealable event; and that the court's assessment of the appellant's role in the offense was not clearly erroneous. Consequently, we affirm the substantial prison sentence imposed below.

## I.   BACKGROUND

Defendant-appellant Patricia A. Teeter is a forty-something-year-old woman whose story, insofar as relevant here, reflects misplaced affection, terrible judgment, and the gruesome depths of man's inhumanity to man. We recount the tale at some length.

The appellant's troubles began when she forged a close friendship with Steven Brown despite warnings from friends that Brown had a propensity for violence. On March 22, 1999, a matrimonial court found that Brown had physically abused his estranged wife, Deborah, and the couple's minor children. The court dealt Brown a series of heavy blows: it awarded custody to Deborah, sanctioned her departure from New York, and ordered Brown to refrain from any contact either with her or the children. Brown told the appellant of the court's decree, leaving no doubt about his perturbation.

On March 27, Brown asked the appellant to accompany him on a "vacation" trip to Maine (during which he would retrieve

-4-

his dog from Deborah). Although the appellant knew that Brown had threatened violence against Deborah if he lost custody of his offspring, she nonetheless agreed to the excursion. She then watched Brown pack her car with a small arsenal, including an SKS assault rifle, a .20 gauge shotgun, ammunition for the weapons, and a pair of knives. Brown also stowed duct tape, rope, and two hand-held radios aboard the vehicle.

The "vacationers" departed from New York early the next morning. Once in New Hampshire, they temporarily abandoned the appellant's car, rented another vehicle, and proceeded to Lebanon, Maine. They eventually located the trailer occupied by Deborah, her children, her brother, her father, and her new swain. The new arrivals spent the afternoon and evening spying on the group while Brown formulated a plan for Deborah's abduction.

That night, Brown instructed the appellant to approach the trailer and attempt to lure one of the male occupants outside by claiming (falsely) that she was having car trouble. Brown told the appellant that if she succeeded, he would then incapacitate the good Samaritan. Following Brown's script, the appellant inveigled Deborah's brother, Donald Wood, Jr., to come outside. Brown hit him over the head with a piece of lead pipe as he approached the rental car. The blow made an "eerie" sound

that the appellant later said she would never forget. Brown then dragged Wood into the woods — out of the appellant's sight — and stabbed him twice. As matters turned out, this last bit of mayhem was totally unnecessary, inasmuch as an autopsy later revealed that the blow to the head was fatal.

At Brown's request, the appellant returned to the trailer and, telling the same apocryphal tale, convinced Deborah's consort, Chris Brouillard, to inspect the car. When Brouillard approached, Brown forced him to the ground, questioned him about his relationship with Deborah, struck him with the pipe, dragged him into the copse, and stabbed him three times.

Not content with two murders, Brown instructed the appellant to fetch yet another victim from the trailer. Although the appellant attempted to comply, the third try did not go according to the script. Deborah — her suspicions aroused by the previous activity — insisted that she drive her own truck to the spot where the appellant's vehicle ostensibly had been stranded. As Deborah neared the rental car, she spied Brown lurking in the woods and drove away at high speed. After a short interval, she returned to the trailer. When she pulled into the driveway, Brown forced her into the rental car at gunpoint and drove to New Hampshire (with the appellant as an

added passenger). The rental car was returned only after the appellant had wiped it down to obliterate her fingerprints.

The trio proceeded in the appellant's automobile to a motel in East Greenbush, New York. Acting on Brown's instructions, the appellant rented two adjoining rooms (one for herself, one for her fellow travelers). To prevent Deborah from calling for help, Brown removed the telephone from his room and gave it to the appellant. During the day, the appellant washed Brown's bloodstained clothes and ran errands for him. While away from the motel, she called a friend who informed her that Wood and Brouillard were dead, and that the police had mounted a manhunt for Brown. The appellant made no attempt either to flee or to contact the authorities. When the police raided the motel the next morning, she vainly attempted to warn Brown by giving a prearranged signal.

Following her arrest, the appellant faced a plethora of federal and state charges. With respect to the federal charges, she eventually entered into a plea agreement and admitted her guilt as to one count of conspiracy, two counts anent the use of a firearm in connection with a crime of violence, two counts of aiding and abetting interstate domestic violence, one count of aiding and abetting interstate stalking, and one count of aiding and abetting the interstate violation of

a protection order.  18 U.S.C. §§ 2, 371, 924(b)-(c), 2261(a), 2261A, 2262(a)-(1).  The appellant also agreed not to contest certain of the state charges.[2]  In return, the United States agreed to dismiss three other counts, including one for kidnapping.  The parties stipulated, for federal sentencing purposes, to a BOL of 43 (a figure derived by cross-reference to the first-degree murder guideline, USSG §2A1.1).  Finally, the appellant waived her right to appeal any sentence imposed by the district court.

The court convened a change-of-plea hearing on January 19, 2000.  At that session, the court queried the appellant as to her overall understanding of the plea agreement, confirmed that no unexpressed promises had been made to her, and determined that she was changing her plea voluntarily.  However, the court neglected to mention the waiver of appellate rights contained in the plea agreement.  Instead, it told the appellant, without qualification and without any demurrer from the prosecutor, that she would have a right to appeal any sentence imposed.

---

[2]In line with this aspect of the agreement, the appellant eventually pled guilty in a Maine state court to two counts of felony murder and one count of kidnapping.  She received a twenty-year incarcerative sentence, to be served concurrently with the sentence previously imposed by the federal district court.

At the disposition hearing (which stretched over several days), the appellant asseverated that notwithstanding the terms of her plea agreement, the district court should renounce the suggested cross-reference and recalculate her BOL. As a fallback, she argued that even if the cross-reference endured, she was entitled to a downward departure because she had never intended that Wood or Brouillard perish. Lastly, she sought a role-in-the-offense adjustment on the ground that she was a minimal (or, at most, minor) participant in the criminal activity.

The sentencing court rejected each and all of these importunings. The court cross-referenced to the first-degree murder guideline to reach a BOL of 43, reduced the offense level to 40 because the appellant had both accepted responsibility for her actions and cooperated with the authorities, see USSG §3E1.1, and used that figure in calculating her GSR (eschewing any role-in-the-offense discount). Given the absence of any significant criminal history, these computations yielded a GSR of 292-365 months. The court sentenced the appellant at the bottom of that range but added a mandatory consecutive sentence of 60 months on the firearm counts. The court then advised the appellant, without tailoring its comments to the contours of the plea-agreement waiver of appeal, "that you have a right to

appeal this sentence if you wish to do so."  The prosecutor did not attempt to correct this apparent misstatement.

This timely appeal ensued.  In it, the appellant seeks to revisit the issues that she unsuccessfully advanced at the disposition hearing.  Before discussing that proffer, however, we first must confront the government's contention that this appeal cannot go forward because Teeter should be held to the terms of the waiver embedded in her plea agreement.

## II.  PRESENTENCE WAIVERS OF APPELLATE RIGHTS

We divide this portion of our opinion into three segments.  First, we discuss the validity in general of presentence waivers of appellate rights.  Next, we explore the specific criteria and conditions that must be met in order for such waivers to be effective, as well as the general power of appellate courts to override such waivers in the interests of justice.  Finally, we assay the waiver at issue here.

### A.  Presentence Waivers of Appellate Rights:  An Overview.

The basic argument against presentence waivers of appellate rights is that such waivers are anticipatory:  at the time the defendant signs the plea agreement, she does not have a clue as to the nature and magnitude of the sentencing errors that may be visited upon her. Her waiver typically embraces all determinations later made by the sentencing court — some of

which may never have occurred either to her or to the government, and some of which may be quite different than either thought possible. In a certain sense, then — though not in the usual criminal law sense — a waiver of the right to appeal cannot be "knowing." In the appellant's view, this is a fundamental defect — and one that distinguishes presentence waivers of appellate rights from other waivers contained in a plea agreement.

We are not unsympathetic to this argument. Withal, three reasons counsel persuasively in favor of a rule that accords general validity to presentence waivers of appellate rights.[3] First, waivers are not inherently suspect in criminal cases any more than in civil cases. Criminal defendants typically may waive their rights, as long as they do so

_____

[3]We note at the outset that the sort of waiver we are discussing differs from the waiver disapproved in Worcester v. Commissioner, 370 F.2d 713 (1st Cir. 1966). There, the Commissioner sought to estop the taxpayer by reference to a related criminal case. We rejected that effort, finding the criminal proceeding to have been tainted because the court had pressured the taxpayer-defendant into waiving his right to appeal in exchange for a lighter sentence. Id. at 718 (explaining that "[t]he court was without right to bargain thus with the defendant, or to put a price on an appeal"). We expressed concern that, if we permitted this sort of plea bargaining, a sentencing court might abuse its power in order to avoid appellate review, and the defendant, in an unequal bargaining position, would have little choice but to go along. Id. When, as now, the agreement is between the prosecution and the defense (and, thus, subject to the independent supervision of the trial court), the Worcester rationale is inapposite.

voluntarily and with knowledge of the general nature and consequences of the waiver. See <u>Adams</u> v. <u>United States</u>, 317 U.S. 269, 275 (1942) (discussing waiver of right to jury trial); <u>Johnson</u> v. <u>Zerbst</u>, 304 U.S. 458, 464-67 (1938) (discussing waiver of right to counsel). Indeed, guilty pleas are a staple of our criminal justice system — and a guilty plea inevitably entails a waiver of numerous rights. Although many of these waivers pertain to future events — a waiver of the right to trial by jury is a good example — their prospective nature has never been thought to place them off limits or to render the defendant's act "unknowing."

Moreover, the idea of permitting presentence waivers of appellate rights seems relatively tame because the right to appeal in a criminal case is not of constitutional magnitude. See <u>Jones</u> v. <u>Barnes</u>, 463 U.S. 745, 751 (1983). Since the Supreme Court repeatedly has ruled that a defendant may waive constitutional rights as part of a plea agreement, <u>e.g.</u>, <u>Town of Newton</u> v. <u>Rumery</u>, 480 U.S. 386, 393 (1987); <u>Brady</u> v. <u>United States</u>, 397 U.S. 742, 752-53 (1970), it follows logically that a defendant ought to be able to waive rights that are purely creatures of statute.

The Criminal Rules themselves lend support to this conclusion. Effective December 1, 1999, the Supreme Court, with

-12-

the approval of Congress, amended the Criminal Rules to provide specifically that, during a change-of-plea hearing, the presiding judge "must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands . . . the terms of any provision in a plea agreement waiving the right to appeal."  Fed. R. Crim. P. 11(c)(6).  While the advisory committee, in its explanatory note, made clear that it took "no position on the underlying validity of such waivers," it recognized that they had become an accepted part of federal plea-agreement practice.  See id., advisory committee notes.  This widespread acceptance of the practice is itself a clear indication that those who deal most frequently with criminal cases have come to conclude that presentence waivers of appellate rights are not forbidden.

Considerations of public policy furnish a second pillar on which to rest a holding that breathes vitality into presentence waivers of appellate rights.  Since criminal defendants are entitled to appeal convictions and sentences as a matter of statutory right, see 18 U.S.C. § 3742; 28 U.S.C. § 1291, a defendant is unlikely to waive this right unless she believes that some feature of a proffered plea agreement makes it worth her while to do so.  Allowing a criminal defendant to agree to a waiver of appeal gives her an additional bargaining

-13-

chip in negotiations with the prosecution; she may, for example, be able to exchange this waiver for the government's assent to the dismissal of other charges. This benefit is very real; in some cases the government, without such a waiver, might not be willing to plea-bargain at all.

The benefit to the prosecution — conservation of resources — is obvious.[4] In the same vein, presentence waivers of appellate rights also husband judicial resources by discouraging groundless sentencing appeals. With court-appointed counsel freely available and nothing to lose by trying, a defendant, unfettered by a waiver agreement, is quite likely to appeal on a wing and a prayer. Reducing the number of baseless appeals promotes both efficiency and finality in the adjudication of criminal cases.[5]

These policy considerations properly factor into our assessment of presentence waivers of appellate rights. Cf. New

---

[4]Less obvious, perhaps, is the protection against bait-and-switch tactics on the part of a defendant who makes concessions to the government and then seeks to keep what she got and withdraw what she gave. In the last analysis, it is up to the courts to keep this balance steady and true.

[5]Finality is an especially important consideration in society's attempt to administer a zetetick criminal justice system. Its virtues have been extolled elsewhere, e.g., Daniels v. United States, 121 S. Ct. 1578, 1582 (2001); Lackawanna County Dist. Atty. v. Cross, 121 S. Ct. 1567, 1573-74 (2001), and it would be pleonastic to rehearse them here.

York v. Hill, 528 U.S. 110, 117 (2000) ("We allow waiver of numerous constitutional protections for criminal defendants that also serve broader social interests."). They indicate that the government, the defendant, and the judicial system all have something to gain from presentence waivers of appellate rights. This makes the device attractive: broadly speaking, plea agreements are in the best interests of the parties and the criminal justice system, United States v. Penta, 898 F.2d 815, 817 (1st Cir. 1990); Correale v. United States, 479 F.2d 944, 947 (1st Cir. 1973), and the more options that both sides have, the more likely it is that they will reach an accord.

The third reason supporting a rule that accords validity to presentence waivers of appellate rights is the sheer weight of authority. On a close question, where no obviously right or wrong answer exists, courts of appeals should strive to avoid creating needless conflicts. In this instance, presentence waivers of appellate rights have been accepted by all nine of the circuit courts which have passed upon their validity. See United States v. Hernandez, 242 F.3d 110, 113 (2d Cir. 2001); United States v. Fleming, 239 F.3d 761, 763-64 (6th Cir. 2001); United States v. Jemison, 237 F.3d 911, 917 (7th Cir. 2001); United States v. Nguyen, 235 F.3d 1179, 1182 (9th Cir. 2000); United States v. Cuevas-Andrade, 232 F.3d 440, 446

-15-

(5th Cir. 2000); United States v. Brown, 232 F.3d 399, 403 (4th Cir. 2000); United States v. Black, 201 F.3d 1296, 1300 (10th Cir. 2000); United States v. Howle, 166 F.3d 1166, 1168 (11th Cir. 1999); United States v. Michelsen, 141 F.3d 867, 871 (8th Cir. 1998). While these courts set varying boundaries, they all agree that, under ordinary circumstances, a knowing, voluntary waiver of the right to appeal from a sentence, contained in a plea agreement, ought to be enforced.[6] Absent some convincing countervailing argument — and we are aware of none — we are reluctant to brush aside this collective wisdom. Thus, this unanimity strongly suggests that such waivers, if appropriately drafted, asserted to, and explained, should be honored.

We will not paint the lily. Given the general availability of waivers in criminal cases, the public policy gains to be reaped by allowing plea-agreement waivers of appellate rights, and the impressive body of precedent

---

[6]Although the courts of appeals have been consentient, we note that individual judges have demurred. E.g., United States v. Melancon, 972 F.2d 566, 570-80 (5th Cir. 1992) (Parker, J., concurring); United States v. Perez, 46 F. Supp. 2d 59, 64-72 (D. Mass. 1999); United States v. Johnson, 992 F. Supp. 437, 438-40 (D.D.C. 1997); United States v. Raynor, 989 F. Supp. 43, 43-49 (D.D.C. 1997). Some commentators also have argued against the validity of presentence waivers of appellate rights. E.g., Jack W. Campbell IV & Gregory A. Castanias, Sentencing-Appeal Waivers: Recent Decisions Open the Door to Reinvigorated Challenges, The Champion, May 2000, at 34.

sanctioning such waivers, we hold that presentence waivers of appellate rights are valid in theory.

### B. Criteria and Conditions.

We do not lend our imprimatur to such waivers indiscriminately. There are obvious dangers attendant to the practice. Sentences ultimately are imposed by the district courts, which must make sentencing determinations under controlling law. When a district court errs in sentencing, that error may be manifest on the record. Thus, in addition to concerns about fairness to the defendant, an institutional interest – public confidence in the judicial system – may be adversely affected if such errors go uncorrected. To ameliorate these risks, we deem it appropriate that such waivers meet stringent criteria. Even then, we think that limits must be set on the effect that can be given to them. It is to those criteria and conditions that we now turn.

The baseline for any waiver of rights is that the defendant enter into it knowingly and voluntarily. Rumery, 480 U.S. at 394. In the plea-bargain context, the text of the plea agreement and the content of the change-of-plea colloquy are critically important to a determination of knowledge and

volition.  See, e.g., United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994) (examining both the text of the plea agreement and the change-of-plea colloquy to determine whether a guilty plea was entered knowingly and voluntarily).  Like other courts, e.g., Jemison, 237 F.3d at 916-18; Nguyen, 235 F.3d at 1182-83, we will consult those sources in determining the validity of a particular presentence waiver of appellate rights.

We look first to confirm that the written plea agreement signed by the defendant contains a clear statement elucidating the waiver and delineating its scope.  E.g., Fleming, 239 F.3d at 762; Brown, 232 F.3d at 401.  Mindful that Rule 11(c)(6), quoted supra at 11, specifically recognizes the importance of the change-of-plea hearing to any waiver of appellate rights, we next will examine the transcript of that hearing.  The focus of this inquiry is to ascertain whether the court's interrogation suffices to ensure that the defendant freely and intelligently agreed to waive her right to appeal her forthcoming sentence.

In respect to presentence waivers of appellate rights, several courts had held, without reference to the neoteric provisions of Rule 11(c)(6), that the district judge must question the defendant specifically about her understanding of

the waiver provision and adequately inform her of its ramifications. E.g., Jemison, 237 F.3d at 917-18; Brown, 232 F.3d at 401-02, 405-06. While some courts previously had held waivers of appellate rights to be valid despite the absence of specific questioning during the change-of-plea colloquy, e.g., Michelsen, 141 F.3d at 871-72; United States v. Wenger, 58 F.3d 280, 282 (7th Cir. 1995), these decisions antedate the adoption of Rule 11(c)(6). That rule — which was in force when Teeter changed her plea — alters the decisional calculus. In explicating the rationale for adopting the rule, the advisory committee made it pellucid that such an inquiry, properly performed, offers considerable assurance of the defendant's knowledge and volition. See Fed. R. Crim. P. 11(c)(6), advisory committee notes. Consequently, we hold that the district court must inquire specifically at the change-of-the-plea hearing into any waiver of appellate rights.[7] Neglecting this duty will constitute error and may serve to invalidate the waiver, depending upon what the record shows as to the defendants' knowledge (that is, whether the defendant, notwithstanding the

---

[7]We refrain from prescribing any mandatory language for such an inquiry because the circumstances will vary from case to case, from defendant to defendant, and from plea agreement to plea agreement. We caution only that the court's interrogation should be specific enough to confirm the defendant's understanding of the waiver and her acquiescence in the relinquishment of rights that it betokens.

absence of a particularized inquiry, understood the full significance of the waiver) and the existence vel non of prejudice.  See United States v. Bushert, 997 F.2d 1343, 1351-52 (11th Cir. 1993); see also Fed. R. Crim. P. 11(h).

Of course, courts ought to strive for consistency. While not necessarily a fatal error, a court can compromise an otherwise adequate change-of-plea colloquy by sending contradictory messages to the defendant.  One potential source of confusion looms when the trial court, acting pursuant to Federal Rule of Criminal Procedure 32(c)(5),[8] tells the defendant at sentencing about her right to appeal.  If a presentence waiver of appellate rights is in place, the court should be especially careful in its choice of words, taking pains to explain to the defendant that her right to appeal is circumscribed by her preexisting waiver.

One court has held that a blanket assurance about the right of appeal, delivered when sentence is pronounced, cancels

---

[8]The rule provides in pertinent part:

> After imposing sentence in any case, the court must advise the defendant of any right to appeal the sentence, and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal in forma pauperis.

Fed. R. Crim. P. 32(c)(5).

a preexisting waiver of appellate rights.  <u>United States</u> v. <u>Buchanan</u>, 59 F.3d 914, 917-18 (9th Cir. 1995) (holding that the sentencing court's statement created "a reasonable expectation" on the defendant's part that he could appeal his sentence, notwithstanding the preexisting waiver).  Other courts have disagreed, <u>e.g.</u>, <u>United States</u> v. <u>Atterberry</u>, 144 F.3d 1299, 1301 (10th Cir. 1998); <u>Michelsen</u>, 141 F.3d at 872, and so do we.  While broad assurances to a defendant who has waived her appellate rights (e.g., "you have a right to appeal your sentence") are to be avoided — they muddy the waters and tend to instill false hope — they do not effect a per se nullification of a plea-agreement waiver of appellate rights.  Whether such assurances may constitute reversible error in particular cases, and if so when, are matters that may be left for another day.

We add a coda.  We have endeavored to provide general guidance to the district courts and the bar concerning plea-agreement waivers of appellate rights.  We caution, however, that because such waivers are made before any manifestation of sentencing error emerges, appellate courts must remain free to grant relief from them in egregious cases. When all is said and done, such waivers are meant to bring finality to proceedings conducted in the ordinary course, not to leave acquiescent defendants totally exposed to future vagaries (however harsh,

-21-

unfair, or unforeseeable).  Our basic premise, therefore, is that if denying a right of appeal would work a miscarriage of justice, the appellate court, in its sound discretion, may refuse to honor the waiver.[9]  As a subset of this premise, we think that the same flexibility ought to pertain when the district court plainly errs in sentencing.[10]

In sum, we conclude that plea-agreement waivers of the right to appeal from imposed sentences are presumptively valid (if knowing and voluntary), but are subject to a general exception under which the court of appeals retains inherent power to relieve the defendant of the waiver, albeit on terms that are just to the government, where a miscarriage of justice occurs.  In charting this course, we recognize that the term "miscarriage of justice" is more a concept than a constant.

---

[9]This category is infinitely variable, but, by way of illustration, we would include within it situations in which appellants claim that their sentences were based on constitutionally impermissible factors (say, race or ethnicity), Brown, 232 F.3d at 403; United States v. Schmidt, 47 F.3d 188, 190 (7th Cir. 1995), or that the plea proceedings were tainted by ineffective assistance of counsel, Hernandez, 242 F.3d at 113-14; Jemison, 237 F.3d at 916 n.8.

[10]To cite a few examples, we do not think that a waiver should be construed to bar an appeal if the trial court imposes a sentence exceeding the maximum penalty permitted by law, Black, 201 F.3d at 1301; United States v. Attar, 38 F.3d 727, 729-32 (4th Cir. 1994), or one that violates a material term of the plea agreement, Michelsen, 141 F.3d at 872; United States v. Navarro-Botello, 912 F.2d 318, 321 (9th Cir. 1990).

Nevertheless, some of the considerations come readily to mind: the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result. Other considerations doubtless will suggest themselves in specific cases.

We recognize, too, that this general reservation will, at least at the outset, lessen what the government sees as the prime benefit of its bargain: the automatic cutoff of debate and the opportunity to get appeals dismissed on motion. Realistically, however, the outlook is not entirely bleak. While open-ended, the general reservation that we envision will be applied sparingly and without undue generosity. Motions to dismiss will still be entertained and, by appealing after promising not to do so, defendants will risk giving the government an option to disclaim a plea agreement, if it wishes to do so.

We acknowledge that this approach represents a break with precedent. Although several of our sister circuits have made clear, in approving presentence waivers, that there will be only narrowly circumscribed exceptions, e.g., Jemison, 237 F.3d

at 911; <u>Brown</u>, 232 F.3d at 403; <u>Michelsen</u>, 141 F.3d at 872, we do not feel comfortable adopting any rigid taxonomy without more experience.  Relief from waivers has traditionally occurred on a fact-specific basis.  We believe that the general reservation which we adopt today is sufficiently broad to capture any truly deserving case but demanding enough to prevent defendants who have agreed to waive their right to appeal from successfully pursuing garden-variety claims of error.

## C.  **Waiver in the Instant Case**.

Having constructed a framework for determining when waivers of appellate rights will be enforced, we ponder the waiver in this case.  The following language appears in paragraph five of the plea agreement:

> The Defendant is aware that 18 U.S.C. § 3742(a) affords a defendant the right to appeal the sentence imposed. Knowing that, in exchange for the Government's concessions made herein, the Defendant waives to the full extent of the law any right to appeal . . . the conviction and sentence, or the manner in which it was determined . . . .

This explicit text is followed by a statement acknowledging the appellant's voluntary acceptance of the entire plea agreement and confirming that she has read and understood it.  The appellant and her attorney signed the document immediately beneath this acknowledgment.  These desiderata furnish prima facie evidence of the appellant's knowledge and volition.

-24-

What occurred next is somewhat more problematic. During the change-of-plea colloquy, the district court questioned the appellant concerning her overall understanding of, and acquiescence in, the terms of the plea agreement, but did not direct her attention to the waiver provision. As we have said, the validity of a waiver of appellate rights depends on whether the waiver was knowingly and voluntarily undertaken. Here, the court — hampered, no doubt, by the newness of Rule 11(c)(6) and the consequent lack of any precedential guidance — neither directed the appellant's attention to the waiver provision nor discussed it with her. Compounding that problem, the court, near the end of the Rule 11 colloquy, asked the appellant: "[D]o you also understand that both you and the government will have a right to appeal any sentence I impose?" This unqualified query — to which the prosecutor (not the same person who appears as counsel for the government in this court) inexplicably failed to take exception — drew an affirmative response from the appellant. The premise of this question directly contradicted the tenor of the waiver provision.

Given the court's failure to make inquiry into the waiver, its unfortunate contradiction of the waiver's terms, and

the lack of any correction, then or thereafter,[11] we cannot say with the requisite assurance that the appellant's surrender of her appellate rights was sufficiently informed. Accordingly, we find that the district court transgressed Rule 11(c)(6). The government has not argued that this error was other than prejudicial. We think that the proper remedy, given the circumstances, is to sever the waiver of appellate rights from the remainder of the plea agreement, allowing the other provisions to remain in force. See Bushert, 997 F.2d at 1353-54. Thus, we permit Teeter's appeal to proceed.

## III. THE MERITS

The appellant raises three substantive issues on appeal. First, she argues that the lower court abused its discretion in accepting the stipulated cross-reference to the first-degree murder guideline. Second, she asks us to reverse the court's decision not to depart downward. Finally, she complains that the court committed clear error when evaluating

---

[11]Indeed, immediately following the imposition of sentence, the court exacerbated the problem, stating: "I must advise you, Ms. Teeter, that you have a right to appeal this sentence if you wish to do so. Do you understand that?" Eliciting an affirmative response, the court proceeded to explain, in considerable detail, the requirements for filing an appeal. At no time did the court mention the limitations on the right to appeal ostensibly imposed by the plea agreement. Throughout, the prosecutor stood mute.

-26-

her role in the offenses of conviction. We address these claims sequentially.

## A. **The Cross-Reference.**

When sentences are imposed under the federal sentencing guidelines, the process encompasses certain mechanical aspects. First, the district court must determine the section of the guidelines that applies to the offense(s) of conviction. The court then must look to that guideline section to determine the BOL. This is not as simple as it sounds because some guideline provisions are not self-contained; they require (or, at least, suggest) cross-referencing to other guideline sections to help determine the BOL.

In this case, the sentencing court determined that the appellant's conduct fell, in pertinent part, within the purview of USSG §2A6.2 ("Stalking or Domestic Violence"). This determination was fully consistent with the plea agreement, and the appellant does not contest it. Moving forward, the court noted that section 2A6.2(c) contains a cross-reference provision which reads as follows: "If the offense involved conduct covered by another offense guideline from Chapter Two, Part A (Offenses Against the Person), apply that offense guideline, if the resulting offense level is greater than that determined above." The court found that the pertinent offenses of

conviction fell within the scope of this language and cross-referenced to the first-degree murder guideline (USSG §2A1.1). Because that guideline yielded a higher BOL (43), the court applied it.

The appellant concedes that, in the plea agreement, she stipulated both to this very cross-reference and to the resultant BOL (43). She nonetheless asseverates that the sentencing court erred in embracing this stipulation. Here, however, the appellant stipulated to the facts underlying the cross-reference, and those facts render the sentencing court's use of the cross-reference plausible. No more is exigible to warrant rejection of the appellant's asseveration.

We have analogized plea agreements to contracts, binding upon the prosecution and the defense alike. E.g., United States v. Ortiz-Santiago, 211 F.3d 146, 151 (1st Cir. 2000). We have been scrupulous in holding the government to the due performance of its obligations thereunder, e.g., United States v. Clark, 55 F.3d 9, 12-13 (1st Cir. 1995), and defendants cannot expect to be treated less fastidiously. Consequently, defendants ordinarily should be held to plea-agreement terms that they knowingly and voluntarily accept. See United States v. Alegria, 192 F.3d 179, 185-86 (1st Cir. 1999). But there are caveats. Stipulations about legal issues, for

example, are problematic.  There is language in a number of cases indicating (correctly, we think) that such stipulations normally are not binding on a court. E.g., Estate of Sanford v. Commissioner, 308 U.S. 39, 51 (1939); Weston v. Wash. Metro. Area Transit Auth., 78 F.3d 682, 685 (D.C. Cir. 1996); Gunn v. United States, 283 F.2d 358, 364 (8th Cir. 1960).  Even when stipulations concern facts rather than law, courts traditionally retain the power to relieve parties from them on terms that are just.  E.g., TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995).

Of course, except where the parties have entered into a binding plea agreement under the aegis of Federal Rule of Criminal Procedure 11(e)(1)(C), the stipulations contained in the agreement, even if factual in nature, do not tie the district court's hands.  See United States v. Saxena, 229 F.3d 1, 4-8 (1st Cir. 2000); Ortiz-Santiago, 211 F.3d at 149 n.2. That the court has the power to deviate from such stipulations, however, does not obligate the court to do so.  Should the court decide to accept and act upon factual stipulations for sentencing purposes, the parties usually will be firmly bound.[12]

---

[12]Conceivably, there may be a rare case in which relief from such a stipulation would be justified to avoid a miscarriage of justice or to correct a mutual mistake.  But such cases will be few and far between, and the case at hand is not one of them.

This general rule will apply when, for example, a defendant stipulates to a matter of fact or to the applicability of a sentencing guideline (the legal meaning of which is pellucid) to the unique facts of her case. After all, the defendant knows what she has done, and has little cause for complaint if the district court takes her at her word.

It is much more difficult to justify binding effect for a stipulation that purports to resolve a general issue of law (or one that turns out to do so without acknowledgment). To cite an extreme example, it is difficult to see why a district court that misreads the effective date of a statute bearing on a sentencing determination should automatically be insulated from appellate review because the parties stipulated to the (wrong) effective date. That leaves stipulations as to mixed questions of fact and law. As to such stipulations, generalizations are risky business. The answer, in a particular case, may depend on the extent to which the mixed question is fact-dominated, cf. In re Extradition of Howard, 996 F.2d 1320, 1328 (1st Cir. 1993), or the extent to which the known facts (whether found by the court or stipulated by the parties) make a given answer to the mixed question plausible.

This case involves a combination of these principles. The appellant stipulated to the BOL – 43 – and to the propriety

of using the cross-reference to USSG §2A1.1 found in USSG §2A6.2 to reach that BOL.  To that extent, her challenge to the stipulation is based in law, and thus arguably subject to plenary review.  But there is more:  in the course of the proceedings below, the appellant pled guilty to counts five, six, seven, and ten (among others).  These counts charged her with aiding and abetting interstate domestic violence, interstate stalking, and interstate violation of a protection order.  18 U.S.C. §§ 2, 2261(a)(1)-(2), 2261A, 2262(a)(1).  She admitted to certain facts through her plea agreement, the change-of-plea colloquy, and at sentencing.  Those factual admissions are not now open to challenge — and they suffice to justify the sentencing court's use of the stipulated cross-reference.  We explain briefly.

The applicable sentencing guideline in this case is USSG §2A6.2 (Stalking or Domestic Violence).  As said, this section contains a cross-reference to the first-degree murder guideline, USSG §2A1.1.  This cross-reference arises by virtue of USSG §1B1.3(a)(1)(B) (Relevant Conduct), which pertinently provides that a defendant's BOL shall be determined "in the case of jointly undertaken criminal activity [on the basis of] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that

occurred during the commission of the offense of conviction."
In the district court, the appellant admitted to crossing state
lines to commit illegal acts against Deborah Brown, a
stipulation of fact unchallenged on appeal. Additionally, she
admitted to seeing and hearing Brown's vicious attack on Wood,
yet nonetheless luring the next victim, Brouillard, into a place
of maximum danger. Given these conceded facts, the murder of
the second victim, at the very least, was "a reasonably
foreseeable act" in furtherance of the offenses of conviction.
Consequently, the district court had a plausible factual basis
for cross-referencing to the first-degree murder guideline (as
agreed by the parties) and employing a BOL of 43.

On this point, we find United States v. Robinson, 14
F.3d 1200 (7th Cir. 1994), instructive. There, the defendant
entered into a plea agreement in which he admitted to
distributing specific quantities of drugs. The district court
sentenced him in line with the stipulation. The defendant
nonetheless appealed, claiming that the court erred by failing
to make an independent drug-quantity determination. Id. at
1206. The Seventh Circuit quickly shut down this appeal:

> Robinson pled guilty, and was sentenced
> based on what he admitted in the plea
> agreement, at the guideline level agreed
> upon in the plea agreement. . . . Robinson
> got what he bargained for, he waived any
> right to challenge the contents of the plea

-32-

> agreement when he signed it, and he has no
> basis to challenge it now.

Id.  The same can be said for Teeter.  Having admitted the underlying facts that supported the sentencing court's resort to the stipulated cross-reference, she is unable to challenge that decision on appeal.

### B.  The Downward Departure.

The appellant's fallback position is that, even if the district court appropriately cross-referenced USSG §2A1.1, it nonetheless erred in failing to depart downward.  This argument stems from the fact that the heartland of the first-degree murder guideline involves those who knowingly and intentionally participate in an act of homicide.  If, however, "the defendant did not cause the [victim's] death intentionally or knowingly," the Sentencing Commission has raised the possibility that "a downward departure may be warranted."  USSG §2A1.1, comment. (n.1).  Such a departure was advisable here, the appellant suggests, because she neither knowingly nor intentionally caused the deaths of Wood and Brouillard.

We lack jurisdiction to consider this argument.  For the most part, departure decisions are discretionary, and a defendant cannot appeal from the sentencing court's refusal to grant a downward departure.  Ortiz-Santiago, 211 F.3d at 148; United States v. Pierro, 32 F.3d 611, 619 (1st Cir. 1994).

-33-

Although there is a narrow window of opportunity for cases in which the district court misapprehends its authority to depart, Pierro, 32 F.3d at 619; United States v. Amparo, 961 F.2d 288, 292 (1st Cir. 1992), this case falls within the general rule, not the long-odds exception to it.

Despite the appellant's efforts at creative characterization, this assignment of error involves a discretionary departure decision, pure and simple. Application Note 1 specifically refers to the possibility of a "downward departure" and leaves that possibility squarely in the hands of the sentencing court. Hence, we lack jurisdiction to review the court's refusal to invoke Application Note 1 unless there is some reason to believe that the court misunderstood its options. United States v. Shea, 211 F.3d 658, 674 (1st Cir. 2000).

There is absolutely no basis for any such belief here: the appellant points to nothing that would indicate that the court mistook its authority to depart, and the record makes manifest that Judge Carter knew he had the power to depart but deliberately chose not to do so. Indeed, the judge stated, not once but twice, that he was rejecting the appellant's request for a downward departure based on the facts of record. Under these circumstances, we are foreclosed from second-guessing the court's discretionary decision not to depart from the GSR.

## C.  __The Role-in-the-Offense Adjustment__.

The final arrow in the appellant's quiver also misses the mark.  She asserts that the district court incorrectly failed to reduce her offense level given her unimportant role in the crime spree.  Absent a mistake of law — and we discern none here — we review such factbound status determinations for clear error.  United States v. Garcia, 954 F.2d 12, 18 (1st Cir. 1992).

The appellant says that the lower court should have classified her as a "minimal" or "minor" participant, and decreased her offense level accordingly.  A defendant who seeks a downward role-in-the-offense adjustment must prove her entitlement to it.  See id.  To qualify as a minimal participant and obtain the concomitant four-level reduction, the appellant would have to prove by a preponderance of the evidence that she was, at most, a peripheral player in the criminal activity. See, e.g., USSG §3B1.2, comment. (n.2) (giving, as an example of a minimal participant, "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment").  To qualify as a minor participant and obtain the concomitant two-level reduction, the appellant would have to prove by a preponderance of the evidence that she was "less culpable than most other participants."  Id., comment.

(n.3).  This means that she must be not only less culpable than her cohorts in the particular criminal endeavor, but also less culpable than the majority of those within the universe of persons participating in similar crimes.  See United States v. Murphy, 193 F.3d 1, 9 (1st Cir. 1999); United States v. Ocasio, 914 F.2d 330, 333 (1st Cir. 1990).

Given the allocation of the burden of proof, a defendant who seeks a downward role-in-the-offense adjustment usually faces an uphill climb in the nisi prius court.  The deferential standard of review compounds the difficulty, so that a defendant who fails to persuade at that level faces a much steeper slope on appeal.  "We have declared, with a regularity bordering on the echolalic, that . . . battles over a defendant's status . . . will almost always be won or lost in the district court."  United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998) (citations and internal quotation marks omitted).  This is such a case.

The court below determined that the appellant was considerably more than a bit player in the unfolding tragedy. This determination is amply rooted in the record.  The appellant facilitated Brown's travel plans; went with him to Maine; helped him track down his prey; lured the first victim (Wood) from the trailer to a locus where Brown could more easily get to him,

knowing that Brown had incapacitation in mind; put the second victim (Brouillard) in harm's way after seeing Brown brutally attack Wood; aided Brown in abducting and holding hostage his estranged wife; maintained her allegiance even after receiving irrefutable proof of the murders; and attempted to warn Brown when the police arrived.

To be sure, the facts can be marshaled in such a way as to put the appellant in a somewhat more sympathetic light. The appellant's able counsel strives valiantly to transform the case in this fashion: he claims that the appellant agreed only to spend a romantic weekend holiday with her boyfriend in Maine, and that what happened thereafter was largely beyond her control. This spin does not carry the day, however, because the sentencing court was fully entitled to draw a different, more sinister, set of inferences from the largely undisputed facts. See United States v. Santiago-Gonzalez, 66 F.3d 3, 7 (1st Cir. 1995); Garcia, 954 F.2d at 18. Accordingly, we uphold the district court's eschewal of a downward role-in-the-offense adjustment. See United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990) (explaining that "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous").

## IV. CONCLUSION

We need go no further. Although we afford the appellant a full right of appeal notwithstanding the waiver of appellate rights contained in her plea agreement, we reject each and all of her claims of error. Her conviction and sentence must, therefore, be

**Affirmed**.