# United States Court of Appeals
## For the First Circuit

No. 15-1655

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL BEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Vivianne Jeruchim, with whom Jeruchim & Davenport, LLP, was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 9, 2016

**KAYATTA**, <u>Circuit Judge</u>.  Paul Bey pleaded guilty to a variety of drug and firearm offenses.  Pursuant to Federal Rule of Criminal Procedure 11(a)(2), Bey's plea agreement reserved his right to have this court review the district court's denial of his motion to suppress the results of a search following an evidentiary hearing.  Otherwise, the plea agreement expressly waived Bey's right to appeal his conviction, or to appeal any sentence that did not exceed seventy months.  Bey now appeals not only the denial of the suppression motion, but also his sixty-month sentence, arguing that enforcing his waiver of any right to challenge his sentence would be a miscarriage of justice because the trial court incorrectly calculated the sentencing range under the United States Sentencing Guidelines (the "Guidelines").  For the reasons that follow, we affirm the denial of the suppression motion and reject the challenge to the sentence as waived.

## I.   Background

Because this appeal follows a guilty plea, we derive the facts from the plea agreement, the change-of-plea colloquy, the unchallenged portions of the presentence investigation report, and the sentencing hearing transcript.  <u>See</u> <u>United States</u> v. <u>Ocasio-Cancel</u>, 727 F.3d 85, 88 (1st Cir. 2013).  Further, "we recite the [additional] facts as found by the district court [in the evidentiary hearing] to the extent they are not clearly

erroneous."[1]  United States v. Beras, 183 F.3d 22, 24 (1st Cir. 1999).

On July 19, 2013, five police officers with the Everett, Massachusetts, Police Department sought to execute a warrant for Bey's arrest that stemmed from a domestic violence dispute involving a firearm.  Based on information offered by the victim of that earlier offense, the officers determined that Bey was likely staying at the home of Clarissa Summons in Everett.  Bey was barred from being within 100 yards of Summons's residence by an abuse prevention order.

Sergeant Stallbaum was one of the five officers who arrived at Summons's apartment and later testified at the evidentiary hearing.  Stallbaum, in testimony credited by the district court, stated that Summons responded to the officers' knocks on her front door.[2]  Asked whether Bey was inside, Summons repeated aloud, "Is Paul Bey here?", and stated that she was not sure whether Bey was in the residence.  According to Stallbaum, Summons then looked to her left and put her finger to her lips in

---

[1] Bey asserts that several of the district court's credibility determinations were clearly erroneous.  We address these arguments at greater length later in this opinion.

[2] Three officers approached the front door, while two went to the back of the house in case someone tried to run out the back door.  Of the three at the front door, two were in plain clothes and one was in uniform.  All three front-door officers were armed, but their firearms were holstered.

- 3 -

a hushing gesture. She then backed into the apartment while opening the door to the home. The officers took this as both an acknowledgment of Bey's presence in the residence and an invitation to enter.

At this point, the officers entered the home, drew their weapons, and quickly found Bey in a bedroom. Concerned for his own safety, Stallbaum moved a black backpack on a nearby bed away from Bey's reach, later testifying that he noticed that the bag felt heavy and the objects inside were distributed unevenly. The officers handcuffed Bey and asked him, before issuing <u>Miranda</u> warnings, whether the backpack was his. Bey told the officers the bag belonged to Summons. The officers removed Bey from the apartment.

After Bey's departure, several officers stayed behind and "look[ed] around" Summons's apartment. While Stallbaum left to obtain a standard-issue consent to search form, another officer on the scene, Officer McCabe, asked Summons for detailed information regarding her four-year-old son who lived in the home and was present at the time of the arrest. At some point in this conversation, McCabe mentioned contacting the Massachusetts Department of Children and Families ("DCF"). The district court found that McCabe did not, however, refer directly to the possibility of removing Summons's son from the home.

Following that interaction, Stallbaum returned and asked Summons to sign the consent to search form, seeking her permission to search the premises for evidence of the gun used by Bey in the domestic violence offense that had prompted the arrest. Stallbaum told Summons that she was free to withhold her consent, but, if she did, she and her son would have to leave the house for several hours while the police secured the apartment and applied for a search warrant. Stallbaum, at this point, had no knowledge of the earlier conversation between McCabe and Summons regarding the DCF.

Summons signed the consent to search form. She told the officers that the black backpack belonged to her but that she was lending it to Bey. A search of the backpack yielded a loaded 9 millimeter semi-automatic pistol with two magazines of ammunition, a plastic bag containing 15.31 grams of marijuana, a medication container containing 22.5 15-milligram oxycodone pills, and a small electronic scale determined to have cocaine and marijuana residue on it.

On September 24, 2013, on the basis of the evidence found in the backpack, a grand jury issued an indictment accusing Bey of committing six drug and firearm-related offenses. Bey moved to suppress the evidence found in the bag as the fruits of illegal searches of both Summons's residence and the backpack itself. After an evidentiary hearing, the district court denied Bey's

motion.  See United States v. Bey, 52 F. Supp. 3d 299, 300 (D. Mass. 2014).

Bey thereafter entered into a plea agreement whereby he agreed to plead guilty to the indictment's six charges.[3]  Pursuant to this agreement, the government recommended, inter alia, a sentence of seventy months' incarceration and agreed to refrain from seeking an appeal of any sentence imposed below that recommendation.  The agreement explicitly preserved Bey's right to mount a later challenge to the district court's denial of his motion to suppress.  Otherwise, Bey waived his right to appeal his conviction or the sentence he received, unless it exceeded seventy months.  The district court ultimately sentenced Bey to sixty months' incarceration.

## II.  Analysis

### A.  Motion to Suppress

Bey argues that the officers' entrance into Summons's residence and subsequent search of the black backpack were "unreasonable searches and seizures" prohibited by the Fourth Amendment.  U.S. Const. amend. IV.  The government concedes that the officers entered and searched the residence without a search warrant, but argues that the searches in question fell within several of the recognized exceptions to the Fourth Amendment's

---

[3] Count Six was later withdrawn by the government and dismissed at Bey's sentencing hearing.

warrant requirement. In weighing Bey's challenge to the denial of his motion to suppress, we review the district court's legal conclusions de novo and its findings of fact for clear error. United States v. Vázquez, 724 F.3d 15, 19 (1st Cir. 2013).

### 1. The Search of Summons's Apartment

It is not entirely clear that Bey has any right to challenge the entry into Summons's apartment. To assert such a right, Bey needs to show that he had a "reasonable expectation of privacy" in Summons's residence, such that he could later challenge the lawfulness of its search and seek to suppress the evidence found within. See United States v. Symonevich, 688 F.3d 12, 18 n.3 (1st Cir. 2012). While Bey was likely, at the time of the arrest, a regular "overnight guest[]" staying at Summons's residence with her consent and therefore normally would have been entitled to some measure of privacy, Minnesota v. Olson, 495 U.S. 91, 99 (1990), his presence in the home was also in clear violation of an abuse protection order, see Bey, 52 F. Supp. 3d at 300-01.

Generally, one cannot form a legally recognizable expectation of privacy in a place where one is not legally allowed to be. See generally United States v. Battle, 637 F.3d 44, 49 (1st Cir. 2011) (collecting cases). Several other courts have specifically held that a defendant cannot claim a reasonable expectation of privacy to the interior of a home where the defendant's very presence is unlawful due to a restraining order.

- 7 -

See, e.g., United States v. Cortez-Dutrieville, 743 F.3d 881, 884–85 (3d Cir. 2014); Commonwealth v. Morrison, 710 N.E.2d 584, 586 (Mass. 1999). Nevertheless, because the merits of Bey's challenge are easily resolved and because the district court did not consider the issue of Bey's expectation, we assume the reasonableness of that expectation and proceed to consider whether it was honored. See United States v. Weems, 322 F.3d 18, 23 (1st Cir. 2003).

The Fourth Amendment forbids law enforcement from searching a home without a warrant unless the search falls under "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). While the government points to several possibly applicable exceptions, we need consider only the argument that the warrantless entry and search was justified by Summons's consent.

For consent to a search to be valid, the government must prove by a preponderance of the evidence that the consent was uncoerced. See United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008). The presence of coercion is a question of fact based on the totality of the circumstances, including "the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police

- 8 -

questioning or in the environment in which the questioning took place." United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (citing Schneckloth, 412 U.S. at 227, 229, 247)). "Appellate challenges to the district court's factual findings relating to the validity of the consent normally are reviewed only for clear error." Vanvliet, 542 F.3d at 264.

Bey makes no argument that the officers procured Summons's acquiescence to the search of her apartment through "fraud, deceit, trickery or misrepresentation." Id. (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). Rather, he asserts that the police "engaged in coercive tactics" that overpowered Summons's will by "communicat[ing] the absolute need for compliance by Summons." Such tactics, Bey argues, led to Summons becoming "nervous and extremely anxious [because of] the substantial law enforcement presence" and feeling "forced to comply." Essentially, Bey argues, the district court mis-weighed the totality of circumstances in the officers' favor, giving short shrift to Summons's subjective experience of fear and anxiety produced by the presence of the officers.

While "the consenting party's possibly vulnerable subjective state" is a factor in our balancing approach, Twomey, 884 F.2d at 51, it is but one. The district court's finding that there was nothing in "Summons's demeanor that would suggest that her ability to voluntarily consent was diminished," Bey, 52 F.

Supp. 3d at 303, is well supported by the record as developed at the evidentiary hearing. In crediting Stallbaum's account of the front-door interaction and discounting Summons's subsequent testimony as to the overbearing, fear-inducing impression that the officers' presence provoked, we see no clear error in the district court's "careful sifting of the unique facts and circumstances" of the case. Schneckloth, 412 U.S. at 233.

Nor can we deem the officers' behavior so "inherently coercive," United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008), that Summons's "capacity for self-determination [was] critically impaired," Schneckloth, 412 U.S. at 225. The "tactics" the three police officers engaged in here--appearing at a doorstep and doing no more than informing a resident that they were in possession of an arrest warrant for an individual believed to be inside--do not approach the far more robust police activity that we have previously deemed to fall short of being "inherently coercive." See, e.g., Jones, 523 F.3d at 38 (consent provided after "some ten to fifteen government agents, guns drawn, entered [the defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him" not coerced); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (consent provided after defendant "was met at the door of his home by seven or eight law enforcement officers, with guns

drawn," was "arrested and handcuffed," and was "advised . . . of his Miranda rights" not coerced).

Summons was not in custody when she provided consent. During the exchange at the front door, the officers' guns were not drawn and the officers did not attempt to apply any pressure beyond appearing ready and eager to enter. "There was no overt act or threat of force against [Summons]," nor were there "promises made to [her]," nor are there any "indication[s] of more subtle forms of coercion that might flaw [her] judgment." United States v. Watson, 423 U.S. 411, 424 (1976). Indeed, the officers did not even directly ask to be admitted before Summons opened the door to them and (perhaps because she was fearful not of the police but of Bey) signaled that they should enter. Our examination of the totality of the circumstances accords with that of the district court: Summons's decision to admit the officers into her home for the purpose of searching for Bey was knowing and intelligent.

## 2. The Search and Seizure of Bey's Backpack

The district court further found that, by signing the consent to search form, Summons acceded to the government's search of the black backpack found near Bey.[4] Bey, 52 F. Supp. 3d at 303–

---

[4] Because we see no Fourth Amendment violation in the officers' entrance into, and search of, Summons's residence, we need not address Bey's argument that the backpack evidence must be excluded as the "fruit of [a] poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 488 (1963).

06. This additional grant of consent, Bey argues, was obtained through official coercion.

Bey conceded in district court "that Summons possessed common authority to consent to a search based on her ownership and shared use of the backpack." Bey, 52 F. Supp. 3d at 304. Thus, the government's search of the backpack was legal, and the evidence found within it will not be suppressed, if we find that Summons's acquiescence to that search was voluntary. Cf. United States v. Matlock, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.").

Bey argues that Summons's consent to the search of the bag was procured by the officers' threat to call the state's child welfare agency and the invocation of the possibility that her young son would be removed from her home. In Bey's telling, the officers repeatedly threatened Summons with a DCF visit and the removal of her child for a period of "well over 15-20 minutes," during which time the officers had already begun to search the backpack. The officers' later procurement of Summons's signature on the consent form, Bey says, was a post-hoc "cover up" attempt. Given this allegedly overbearing pressure and exploitation of the relationship between a mother and her young son, Bey asserts that Summons could not have consented voluntarily. See, e.g., Lynumn

- 12 -

v. Illinois, 372 U.S. 528, 534 (1963) (confession to police involuntary when made "after the police had told [the suspect] that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'").

This re-creation of what occurred after Bey was arrested and removed from Summons's home differs dramatically from the account provided by the officers and found more credible by the district court. "In the absence of a reason not to do so, this court defers to the district court's personal observations and evaluation of the witnesses' credibility." United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003). The district court found that while Officer McCabe did mention contacting the DCF in conversation with Summons, this exchange occurred during a one-on-one conversation between McCabe and Summons. Bey, 52 F. Supp. 3d at 301. While recognizing that Summons "became concerned" about the potential consequences of any DCF intervention, the district court determined that McCabe never made any reference to the possibility that Summons's son could be removed from the home.[5] Id.

---

[5] McCabe's reference to the DCF and questions regarding the safety of Summons's child appear to have been, in any event, pursuant to official police obligations since McCabe was likely a mandated reporter of potential child neglect under state law. See Mass. Gen. Laws ch. 119, § 51A(a). And, sensibly, there is no penalty in our Fourth Amendment framework for attempts by law enforcement to "secur[e] convenient and prompt consensual access

"Shortly after" this exchange, the court found, Stallbaum returned inside with the consent form and sat down with Summons to review the document, informing her of her right to withhold consent and refraining from making "any . . . threats or promises in an attempt to persuade Summons to sign the form." Id. at 301-02. The court found that Stallbaum had no knowledge of the earlier discussion between Summons and McCabe that touched on the DCF. Id. at 301. The evidence also indicated that the officers did tell Summons what would happen if she did not sign the consent and, in doing so, made no suggestion that the child would be taken. All in all, the district court did not clearly err in ruling that Summons's consent to search the apartment was voluntary.

## B. Sentencing Calculation

Finally, we turn to Bey's challenge to his sentence. In ascertaining the proper Guidelines sentencing range, the district court relied, in part, on the Guidelines' armed career offender enhancement, U.S.S.G. § 2K2.1(a)(3), to classify a prior 2004 conviction as a "crime of violence," see id. § 4B1.2(a). The effect of this classification was to increase the lower and upper ends of the sentencing range by sixteen and twenty months, respectively. The parties agree that, in light of the Supreme Court's subsequent decision in Johnson v. United States, 135 S.

---

[to premises] by conveying accurate information to a recipient." Vázquez, 724 F.3d at 22.

Ct. 2551 (2015) ("Johnson II"), that the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e), is unconstitutionally vague and thus void, id. at 2557, the district court erred. The government nevertheless argues that the waiver of appellate rights contained in the plea agreement stops Bey's appeal in its tracks.

Bey's plea agreement contained a detailed estimation of his sentencing exposure. The agreement's Guidelines calculation materially tracked that adopted by the district court, contemplating a base offense level ("BOL") of 22 based on the career offender enhancement. Elsewhere in the agreement, both Bey and the government forfeited certain appellate rights. With respect to Bey's ability to appeal the sentence he received, the agreement stated:

> Defendant agrees not to file a direct appeal or challenge in a future proceeding (collateral or otherwise) any sentence of imprisonment of 70 months or less or any orders relating to supervised release, fines, forfeiture, and restitution. This provision is binding even if the Court's Guidelines analysis is different from that set forth in this Agreement.

"A defendant who waives his right to appeal and thereafter attempts to avoid the effect of the waiver must confront the waiver head-on." United States v. Miliano, 480 F.3d 605, 608 (1st Cir. 2007). Under our case law, appellate waivers in plea agreements are "presumptively valid," United States v. Teeter, 257

- 15 -

F.3d 14, 25 (1st Cir. 2001), subject to three "stringent criteria," id. at 23. First, the plea agreement must "elucidat[e] the waiver and delineat[e] its scope." Id. at 24. Second, the change-of-plea colloquy must "suffice[ ] to ensure that the defendant freely and intelligently agreed to waive [his] right to appeal." Id. Finally, "if denying a right of appeal would work a miscarriage of justice, the appellate court, in its sound discretion, may refuse to honor the waiver." Id. at 25.

While not tackling these requirements "head-on," Bey's appeal can only be understood as arguing that enforcement of the waiver would work a "miscarriage of justice." We have previously instructed that the miscarriage of justice exception is meant only "to grant relief . . . in egregious cases," id. at 25, and is to "be applied sparingly and without undue generosity," id. at 26. To assess the appropriateness of invoking the exception, we consider "the clarity of the [alleged] error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." Id.

Taking the disputed enhancement out of the equation, the lower end of the sentencing range would still have exceeded the actual sentence. Furthermore, Bey's appellate waiver provision

included not just belt, but also suspenders, expressly stating that it was "binding even if the Court's Guidelines analysis is different from that set forth in this Agreement."

While an unobjected-to Guidelines calculation that the parties agree is overstated in view of Johnson II may in some circumstances be plain error, see, e.g., United States v. Hudson, No. 14-2124, 2016 WL 2621093, at *5-7 (1st Cir. May 9, 2016) (one-level increase in defendant's criminal history category presumably voided by Johnson II vacated and remanded on plain error review), it is not, in this case, a miscarriage of justice so "egregious" that we would decline to enforce the strong appellate waiver clause to which Bey agreed. See Sotirion v. United States, 617 F.3d 27, 38 (1st Cir. 2010) (no miscarriage of justice to overcome appellate waiver when plea agreement misapplied "two-level increase [of defendant's total offense level] for abuse of trust in its calculation of his advisory sentencing guidelines range").

### III. Conclusion

Bey's conviction and sentence are affirmed.