# United States Court of Appeals

## For the First Circuit

No. 02-2504

UNITED STATES OF AMERICA,
Appellee,

v.

SAMUEL SANCHEZ,
Defendant, Appellant.

No. 02-2566

UNITED STATES OF AMERICA,

Appellee,

v.

RAYMOND ANDERSON,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Stahl, Senior Circuit Judges.

George J. West for appellant Sanchez.
Robert B. Mann, with whom Mann & Mitchell was on brief, for appellant Anderson.

Donald C. Lockhart, Assistant United States Attorney, with whom Margaret E. Curran, United States Attorney, and Gerard B. Sullivan, Assistant United States Attorney, were on brief, for the United States.

---

January 7, 2004

---

**SELYA**, <u>**Circuit Judge**</u>.  In these consolidated appeals, two participants in a mindless carjacking and double homicide strive to convince us that the district court sentenced them more onerously than the law permits.  After a painstaking review of the record, we find that the sentencing court committed no reversible error.  Consequently, we leave the appellants' sentences intact.

## I.  TRAVEL OF THE CASE

Because the disputed sentences were imposed following admissions of guilt, we glean the material facts from the change-of-plea colloquies, the presentence investigation reports (PSI Reports), and the transcripts of the disposition hearings.  <u>United States</u> v. <u>Brewster</u>, 127 F.3d 22, 24 (1st Cir. 1997); <u>United States</u> v. <u>Dietz</u>, 950 F.2d 50, 51 (1st Cir. 1991).  Those facts paint a grisly picture.

On the evening of June 8, 2000, Samuel Sanchez, Raymond Anderson, and three other men carjacked Jason Burgeson and Amy Shute at gunpoint.  After confronting the pair in downtown Providence, the malefactors appropriated their vehicle, drove in caravan style to a secluded area, murdered the abducted couple in cold blood, and took what little cash they had.  The brutal crime attracted immediate attention and the authorities quickly rounded up five suspects.

On December 18, 2000, a federal grand jury sitting in the District of Rhode Island indicted Sanchez and Anderson (appellants

-3-

here) and three others for conspiracy to commit a carjacking and carjacking with death resulting. See 18 U.S.C. §§ 371, 2119, & 2119(3). The appellants eventually pleaded guilty to both counts pursuant to written plea agreements in which the government promised not to seek the death penalty. Two of the other persons accused (Gregory Floyd and Harry Burdick) followed the same course and were sentenced to life imprisonment. The final member of the group (Kenneth Day) went to trial and, at the close of the government's case, moved successfully for judgment of acquittal. See Fed. R. Crim. P. 29.

The district court sentenced Sanchez on November 7, 2002.[1] The court arrived at his offense level by applying the first degree murder cross-reference, USSG §§2A1.1, 2B3.1(c); granting a three-level reduction for acceptance of responsibility, id. §3E1.1; and departing upward by three levels, id. §5K2.0. These steps yielded a total offense level of 43. The court then computed Sanchez's criminal history score, assigned him to criminal history category (CHC) II, and sentenced him to life imprisonment.

The court sentenced Anderson six days later. It applied the first degree murder cross-reference; granted a three-level

---

[1]When the district court sentenced the appellants, the November 2002 edition of the sentencing guidelines was in effect. Consequently, we refer throughout to that version. See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("Barring any ex post facto problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.").

reduction for acceptance of responsibility; and departed downward by two levels, "one because of [Anderson's] substantial cooperation and one because he [was] the least culpable." These steps yielded a total offense level of 38. After calculating Anderson's criminal history score, the court placed him in CHC III. This combination (offense level 38; CHC III) produced a guideline sentencing range (GSR) of 292-365 months. The court thereupon imposed a 30-year incarcerative sentence. These timely appeals ensued.

Each appellant advances three assignments of error. Sanchez challenges the district court's denial of a downward role-in-the-offense adjustment, its rejection of his entreaty for a downward departure, and its decision to depart upward. Anderson also challenges the district court's denial of a favorable role-in-the-offense adjustment and its refusal to grant a downward departure based on his state of mind at the time of the homicides. In addition, he questions the calculation of his criminal history score (and, thus, his CHC). We treat the common role-in-the-offense and downward departure issues first. We then address Sanchez's objection to the district court's upward departure and Anderson's complaint about the supposedly unwarranted inflation of his criminal history score.

## II. ROLE IN THE OFFENSE

We begin with the appellants' claims that they deserved two-level reductions because they were minor participants in the

offenses of conviction. A defendant who seeks a downward role adjustment must bear the burden of proof on that issue. United States v. Ocasio, 914 F.2d 330, 332-33 (1st Cir. 1990). The ensuing question — whether to reduce the defendant's offense level due to his minor or minimal role in the offense — is an inquiry heavily driven by the facts. See United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc); USSG §3B1.2, cmt. (n.3(C)). Because the sentencing court has a superior coign of vantage, we must defer to its findings of fact unless those findings are clearly erroneous. Ocasio, 914 F.2d at 333. If a set of facts can lead plausibly to competing inferences, the sentencing court's choice among them cannot be termed a clear error. Cruz, 120 F.3d at 4; United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

Collectively, these standards are not appellant-friendly. Recognizing that reality, we have warned that "absent a mistake of law, battles over a defendant's status . . . will almost always be won or lost in the district court." United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995).

### A. Sanchez's Role in the Offense.

Sanchez asserts that he neither introduced nor used the murder weapon, eschewed any participation in the robbery of the victims, and never threatened to rape Shute. On this basis, he argues that he was less culpable than his coconspirators and therefore deserving of a two-level downward adjustment as a minor

participant. USSG §3B1.2(b). The district court rejected this assertion, and so do we.

The Sentencing Commission has explained that section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." Id. §3B1.2, cmt. (n.3(A)). The roster of available adjustments includes a modest adjustment for minor participation and a somewhat more generous adjustment for minimal participation. Id. §3B1.2.[2] We have ruled that a defendant who aspires to be classified as a minor participant bears the burden of proving that he is both (i) less culpable than most other participants in the offenses of conviction, and (ii) less culpable than the average miscreant involved in offenses of the same genre. See United States v. Ortiz-Santiago, 211 F.3d 146, 149 (1st Cir. 2000); Ocasio, 914 F.2d at 333. Sanchez cannot conceivably run that gauntlet.

We need not tarry. Sanchez effectively admitted during the change-of-plea colloquy that he furnished the car used in committing the crimes, drove his comrades around downtown Providence in search of victims, held himself available as a "getaway driver" should the attempted carjacking go awry, suggested

---

[2]The difference between minor and minimal participation is one of degree. See United States v. Almanza, 225 F.3d 845, 847 (7th Cir. 2000). This case does not require us to draw so fine a distinction.

-7-

where to take the victims following their abduction, searched the carjacked vehicle for valuables, and used some of the appropriated cash. He also admitted that other participants would testify that he urged one of his companions (Floyd) to shoot the victims and that he offered to kill them himself should Floyd balk. Given this scenario, it beggars credulity to think that Sanchez could qualify as a minor participant in the criminal activity. Consequently, we discern no error, clear or otherwise, in the sentencing court's denial of his request for a role reduction.

### B. **Anderson's Role in the Offense**.

Anderson's claim that he deserved a two-level reduction as a minor participant is somewhat more credible. He begins with the sentencing court's comment, voiced during the disposition hearing, that "[h]e was the least culpable [of the gang] because he didn't participate in the actual shooting, and he didn't urge or demand that these innocent young people be killed." This might be thought faint praise, but we assume, for argument's sake, that it constitutes a finding sufficient to satisfy the first prong of the test for minor participation.

Although Anderson pleaded guilty both to conspiracy to commit carjacking and to carjacking resulting in death, the relevant charge for the comparative analysis required by the second prong of the "minor participant" test is carjacking resulting in death. Cf. Jones v. United States, 526 U.S. 227, 229 (1999)

(holding that 18 U.S.C. § 2119 defines three distinct crimes — simple carjacking, carjacking resulting in serious bodily injury, and carjacking resulting in death). In an effort to satisfy this prong, Anderson points to the sentencing court's explicit finding that he lacked an intent to kill and concludes that he must perforce be less culpable than the average felon convicted of carjacking resulting in death. This conclusion does not follow from the indicated premise: whether a carjacker did — or did not — harbor a subjective intent to kill is not a fact of talismanic significance to a role-in-the-offense decision in a case of carjacking resulting in death. Regardless of the lack of an intent to kill, the instant record contains ample evidence from which the sentencing court reasonably could have concluded that Anderson was no less culpable than the average defendant convicted of that offense.

On this record, a rational trier easily could have found that Anderson recruited an accomplice (Sanchez) who made available the car used in committing the crimes; that he accompanied his coconspirators on their prowl through downtown Providence as they hunted for potential victims; that he served as a lookout while the group abducted not one but two innocent young people; that he ordered the victims to exit the carjacked vehicle once the caravan had reached the murder site; that he removed jewelry from Shute's person just prior to her execution; and that he expressed no

disapproval when his compatriots discussed the desirability of murdering the victims. Given Anderson's continuous presence and his willing participation in the aforedescribed events, the lower court plausibly could have inferred, from the totality of the circumstances, that he had failed to prove his entitlement to a minor participation credit. See, e.g., United States v. Nuñez-Rodriguez, 92 F.3d 14, 24 (1st Cir. 1996) (finding no clear error in denial of minor role adjustment when defendant participated in planning the carjacking, drove around with two coconspirators for several hours searching for a likely victim, approached the chosen victim with an armed associate, and drove the carjacked vehicle from the scene despite having heard the fatal gunshot). We conclude, therefore, that the sentencing court's denial of a downward role-in-the-offense adjustment was not clearly erroneous.

## III.  DOWNWARD DEPARTURES

Each appellant sought the benefit of a guideline provision (Application Note 1) that authorizes a downward departure from the base offense level mandated by the first degree murder cross-reference (43) "[i]f the defendant did not cause the death intentionally or knowingly." USSG §2A1.1, cmt. (n.1). The district court rejected these requests (although it granted Anderson a downward departure on other grounds, see supra). The appellants attempt to challenge these rejections. That is easier said than done.

As a general rule, a sentencing court's discretionary refusal to depart is unreviewable. See, e.g., United States v. Teeter, 257 F.3d 14, 30 (1st Cir. 2001); United States v. Pierro, 32 F.3d 611, 619 (1st Cir. 1994). At first blush, that rule would seem to apply here because the decision whether to grant a departure pursuant to Application Note 1 (appended to section 2A1.1) lies completely within the discretion of the sentencing court. See Teeter, 257 F.3d at 29-30; see also USSG §2A1.1, cmt. (n.1) (explaining that "downward departure may be warranted" (emphasis supplied)). But this general rule — like most general rules — admits of certain exceptions. One such exception covers cases in which the sentencing court misapprehends its authority to depart. See Teeter, 257 F.3d at 30; United States v. Gifford, 17 F.3d 462, 473 (1st Cir. 1994).

Each appellant endeavors to fit his case within the narrow confines of this exception. As we explain below, neither succeeds.

## A. Sanchez's Departure Request.

Sanchez starts by adverting to case law that requires trial courts to analyze a defendant's mental state after determining that section 2A1.1 applies. See, e.g., United States v. Carr, 303 F.3d 539, 544-48 (4th Cir. 2002), cert. denied, 537 U.S. 1138 (2003); United States v. Prevatte, 16 F.3d 767, 784 (7th Cir. 1994). Using these cases as a springboard, he seeks to drape

-11-

the denial of his departure request in the raiment of reviewability by insisting that the sentencing court's failure to make a detailed determination of his state of mind at the time of the slayings demonstrated a misapprehension of its power to depart. This argument does little to persuade us that the sentencing court was unaware of its departure-granting authority.

If the district court had granted a downward departure on the basis of Application Note 1, it would have had to factor in the defendant's state of mind to assess the extent of the departure. See USSG §2A1.1, cmt. (n.1) (explaining that if a departure is granted, the sentencing court should base its extent, inter alia, "upon the defendant's state of mind"). But no such direction is provided as to the underlying decision to depart — and here, the district court denied the departure request. Thus, the issue is not what analysis the district court made, but, rather, whether it was required to make particularized findings at all. We think not.

In general, sentencing courts are under no obligation to make specific findings when denying departure requests. See United States v. DeCosta, 37 F.3d 5, 8 (1st Cir. 1994) (explaining that "the district court is not required to give reasons for refusing to depart"). We agree with the Tenth Circuit that this precept extends with undiminished force to the denial of an Application Note 1 departure. See United States v. Nichols, 169 F.3d 1255, 1276-77 (10th Cir. 1999) (concluding that "[n]othing in [USSG

-12-

§2A1.1] requires a district court to make any findings when deciding whether to depart"). Indeed, we held as much, albeit in an unpublished opinion, in United States v. Diaz-Pabon, 187 F.3d 623 (1st Cir. 1998) (table), in which we ruled that "the sentencing court was under no duty to analyze the factors set forth in Application Note 1 to justify its discretionary decision not to depart from the guidelines . . . ."

That holding undermines Sanchez's argument. Because the district court had no obligation to make specific findings, we cannot interpret the absence of a detailed discussion of Sanchez's state of mind as an indication that the court misunderstood its discretionary powers. See United States v. Grandmaison, 77 F.3d 555, 564-65 (1st Cir. 1996) (explaining that mere ambiguity in the sentencing record is insufficient to render the court's refusal to depart reviewable on appeal).

In all events, we must consider the whole of the record when determining whether a sentencing court misapprehended its authority to depart. See United States v. DeLeon, 187 F.3d 60, 69 (1st Cir. 1999); United States v. Morrison, 46 F.3d 127, 130-31 (1st Cir. 1995); Gifford, 17 F.3d at 474-75. Here, the district court supportably found that Sanchez had urged Floyd to shoot the victims and had offered to kill them himself if Floyd faltered. At least implicit in those findings was the court's conclusion that Sanchez had an intent to kill (and, consequently, that he was

ineligible for the desired departure). Viewed in this light, it cannot be said that the sentencing court misunderstood its departure-granting authority. Therefore, we do not have jurisdiction to review Sanchez's assignment of error. See Teeter, 257 F.3d at 30 ("[W]e lack jurisdiction to review the court's refusal to invoke Application Note 1 unless there is some reason to believe that the court misunderstood its options.").

## B. **Anderson's Departure Request**.

Anderson — like Sanchez — seeks to characterize his case as one in which the district court misperceived the extent of its authority to depart under Application Note 1. Specifically, Anderson spotlights the sentencing court's statement that "[h]e didn't have an intent to kill" and complains that the court failed to realize that this finding paved the way for a possible downward departure. To prove his point, Anderson singles out a passage from the transcript of the disposition hearing, in which the judge explained:

> The defendant argues that he shouldn't have a total offense level of 43 because he had no intent to kill. But as I've just indicated, he is charged with that intent because he is an aider and abettor, and whether it's considered a second degree murder or a first degree murder, if it was tried in the state courts the fact of the matter is that he was an accessory before the fact of murder in this case. So the total offense level of 43 is correct.

In Anderson's view, this rationale reveals the court's total unfamiliarity with the authority granted to it by Application Note 1.

Anderson's argument elevates hope over reason. The sentencing court's attempt to explain why it chose not to depart, despite Anderson's perceived lack of an intent to kill, was not especially articulate — but what is conspicuously absent from the quoted passage is any indication that the court felt constrained in its ability to depart. Application Note 1 gives the sentencing court discretion to depart or not, as the court sees fit, if it finds that a given defendant did not cause the death intentionally or knowingly. On a fair reading of the court's comments in this case, it seems highly likely that the court was looking to analogous state criminal law for guidance on how to exercise that discretion. The fact that the court had recognized its authority to depart under the self-same rubric at Sanchez's sentencing — held just six days earlier — reinforces this conclusion. We therefore dismiss Anderson's assignment of error as unreviewable. See Teeter, 257 F.3d at 30.

## IV.  THE UPWARD DEPARTURE

At sentencing, the district court ruled that Sanchez's case fell outside the heartland of comparable carjacking cases and determined that a three-level upward departure was appropriate. The court based this determination on five factors:  death

-15-

resulting, abduction, use of a weapon, extreme conduct, and criminal purpose. Each of these is a recognized — indeed, an encouraged — ground for a departure. See USSG §§ 5K2.1 (death resulting), 5K2.4 (abduction), 5K2.6 (use of a weapon), 5K2.8 (extreme conduct), 5K2.9 (criminal purpose); see generally Koon v. United States, 518 U.S. 81, 94 (1996) ("Encouraged factors are those 'the [Sentencing] Commission has not been able to take into account fully in formulating the guidelines.'" (quoting USSG §5K2.0)). If the sentencing court finds an encouraged factor in a particular case, "the court is authorized to depart if the applicable Guideline does not already take it into account." Koon, 518 U.S. at 96.

Sanchez assigns error to the departure decision, insisting (i) that the court's consideration of these five factors constituted double counting, and (ii) that, in all events, their application was unwarranted in his case. We disagree with these allegations.

Before addressing Sanchez's claims, we comment briefly upon the standard of review. The law is currently unsettled as to whether the PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650, 670, to be codified at 18 U.S.C. § 3742(e) (2003), applies to departure decisions made prior to April 30, 2003 (the Act's effective date).[3]

_____

[3]Although a panel of this court decided that issue in United States v. Thurston, No. 02-1966, slip op. at 45-47 (1st Cir. Aug. 4, 2003) (applying the PROTECT Act's standard of review to appeals

-16-

Thus, our standard of review is in doubt. Compare id. (directing de novo review of departure decisions), with United States v. Dethlefs, 123 F.3d 39, 43-44 (1st Cir. 1997) (describing more deferential pre-PROTECT Act standard of review). Here, however, we would affirm the district court's departure decision under either standard, and so we leave the question unresolved.

## A. **Double Counting**.

Sanchez's first claim — double counting — posits that the departure factors relied upon by the district court were already adequately taken into account, either as specific offense characteristics or as other adjustments, in determining his GSR. We are fully satisfied that the sentencing court did not engage in any double counting when it considered four of the five factors — abduction (§5K2.4), use of a weapon (§5K2.6), extreme conduct (§5K2.8), and criminal purpose (§5K2.9) — as grounds for an upward departure. We explain briefly.

Sanchez makes no coherent argument as to why the sentencing court's use of extreme conduct or criminal purpose in the departure calculus would constitute double counting. In contrast, his argument as to abduction and use of a weapon is coherent but unavailing. It hinges on the fact that the carjacking guideline is derived from, and generally congruent with, the

_____

pending as of April 30, 2003), that opinion has been withdrawn for reconsideration by the panel.

guideline for robbery.  See USSG §2B3.1.  Seizing on this congruence, Sanchez notes that the guideline for robbery allows for the consideration of abduction and use of a weapon when calculating a defendant's base offense level.  See id. §2B3.1(b).

It does not follow, however, that abduction and use of a weapon are already taken into account in carjacking cases in which the murder enhancement applies.  Once a court decides upon the applicability of the first degree murder cross-reference, id. §2B3.1(c), proper procedure requires it to ignore the specific offense characteristics listed under the robbery guideline and move directly to USSG §2A1.1.  The sentencing court followed this protocol in Sanchez's case.  Consequently, there was no double counting.

This leaves the sentencing court's application of the "death resulting" factor (§5K2.1).  It is at least arguable that this can be construed as double counting:  the court might already have provided an enhancement for the fact that the carjacking resulted in death when it followed the instructions found in USSG §2B3.1(c) and applied the first degree murder cross-reference.  See United States v. Barber, 119 F.3d 276, 280-81 & n.3 (4th Cir. 1997) (suggesting that the first degree murder guideline already takes into account the fact that death resulted).

This logic is not defeated by the fact that sentencing courts are authorized, in certain circumstances, to depart from the

-18-

guidelines even though the reason for departure has been taken into consideration as a specific offense characteristic or other adjustment. That authorization is limited to situations in which "the court determines that, in light of unusual circumstances, the weight attached to [the relevant] factor under the guidelines is inadequate." USSG §5K2.0. It would be surpassingly difficult to contend that the first degree murder cross-reference (which raised Sanchez's offense level to 43 — the maximum contemplated by the sentencing guidelines) attributed inadequate weight to the victims' deaths.

Of course, this case is different in the sense that two persons — not just one — were slain. That distinguishing characteristic might very well suffice to counter the charge of double counting. Courts may consider whether the crime resulted in multiple deaths when determining the <u>extent</u> of a departure, <u>see</u> <u>id.</u> §5K2.1, and, by analogy, it would seem sensible to allow consideration of that fact in determining whether to depart at all. Moreover, Sanchez would have received the same base offense level had the carjacking resulted in only one death, so it might well be said that the first degree murder cross-reference failed to take the second death into account. These considerations would tend to justify departing upward. <u>Cf.</u> <u>United States</u> v. <u>Menzer</u>, 29 F.3d 1223, 1234-35 (7th Cir. 1994) (using similar reasoning to support

an upward departure in light of the arson guideline's second degree murder cross-reference).

In the last analysis, however, we need not resolve this question. Even if the sentencing court engaged in double counting with regard to the "death resulting" factor — a matter that we do not decide — the departure as a whole would be sustainable. We have said in the past that

> a departure which rests on a combination of valid and invalid grounds may be affirmed so long as (1) the direction and degree of the departure are reasonable in relation to the remaining (valid) ground, (2) excision of the improper ground does not obscure or defeat the expressed reasoning of the district court, and (3) the reviewing court is left, on the record as a whole, with the definite and firm conviction that removal of the inappropriate ground would not be likely to alter the district court's view of the sentence rightfully to be imposed.

United States v. Diaz-Bastardo, 929 F.2d 798, 800 (1st Cir. 1991); see also Williams v. United States, 503 U.S. 193, 203 (1992); Nuñez-Rodriguez, 92 F.3d at 19. These requirements are fully satisfied here.

In this instance, the four remaining factors cited by the sentencing court provide ample justification for the relatively moderate three-level upward departure. Notwithstanding Sanchez's hyperbolic efforts to classify the extent of the departure as unreasonable, we previously have affirmed similar (and even significantly larger) departures, including departures based upon

analogous circumstances.  See, e.g., United States v. Carrion-Cruz, 92 F.3d 5, 6-7 (1st Cir. 1996) (per curiam) (affirming a three-level departure from level 40 to level 43 due to the "sordid facts" in a multiple-death carjacking case); see also United States v. Chapman, 241 F.3d 57, 65 (1st Cir. 2001) (collecting First Circuit cases affirming departures ranging up to 300%).[4]  As to the final element of the Diaz-Bastardo test, the district court made abundantly clear its belief that the only appropriate sentencing outcome for Sanchez was life imprisonment.  The double-counting claim is, therefore, impuissant.

### B.  **Sufficiency of the Evidence**.

Next, Sanchez argues that whether or not these five factors were legally available, they were factually unsupported (and, thus, should not have figured in the departure calculus). This is whistling past the graveyard:  the record contains more than enough evidence to justify the use of each of the five factors.

A detailed exegesis would serve no useful purpose.  The short of it is that the victims were abducted at gunpoint and transported to a secluded location, where they were psychologically

---

[4]In a rhetorical flourish, Sanchez labels his "outsized" life sentence a cruel and unusual punishment.  Appellant's Br. at 20. The entire Eighth Amendment argument spans only two sentences and Sanchez cites no authority for it.  Because this claim is perfunctory and unaccompanied by developed argumentation, we deem it waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

tormented for a period of time before being murdered execution-style in order to protect the identities of the perpetrators. Against this grim backdrop, only two of Sanchez's subsidiary arguments merit further discussion.

First, Sanchez asseverates that the "use of a weapon" factor does not apply because he never actually used the gun. This asseveration rings hollow. The relevant guideline provision refers to the use or possession of a weapon "in the commission of the offense." USSG §5K2.6. To warrant the application of this provision, it ordinarily suffices that the defendant and the shooter are convicted as coconspirators. See United States v. Connor, 950 F.2d 1267, 1277 (7th Cir. 1991) (indicating that section 5K2.6 will be available where "the possessor of the gun and the defendant are coconspirators, the possessor[] of the gun possessed it in furtherance of the conspiracy, and the defendant was a member of the conspiracy at the time of the possession of the gun").

Second, Sanchez makes a determined assault on the sentencing court's use of the "death resulting" datum. Sanchez's attack rests essentially on two facts: that Sanchez himself neither seized control of the victims' car nor pulled the trigger. These facts are true as far as they go, but they do not take Sanchez very far. His argument unrealistically discounts his actual participation in the criminal activity. As supportably

-22-

found by the sentencing court, Sanchez, among other things, served a critical function as an available getaway driver and actively urged Floyd to kill the victims. We have said before — and today reaffirm — that section 5K2.1 (encouraging "death resulting" departures) may bear the weight of an upward departure even when the defendant is not the direct cause of the victim's death. United States v. Diaz, 285 F.3d 92, 101 (1st Cir. 2002) ("We see no basis for foreclosing departure under §5K2.1 when a defendant puts into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death."); accord United States v. Scheetz, 293 F.3d 175, 191 (4th Cir.), cert. denied, 537 U.S. 963 (2002); United States v. White, 979 F.2d 539, 545 (7th Cir. 1992).

For the foregoing reasons, we uphold the district court's decision to depart upward by three levels in sentencing Sanchez.

## V. THE CHC ASSIGNMENT

In 1999, Anderson was twice convicted of misdemeanors (once for obstructing a police officer and once for possession of marijuana). On each occasion, the state court sentenced him to probation. At the disposition hearing in the instant case, the district court assigned Anderson to CHC III based on the two misdemeanor convictions (worth one point apiece toward his criminal history score) and the fact that, at the time of the carjacking, he

was still on probation (worth two points toward his criminal history score). Anderson deems these four points unwarranted and maintains that he should have been assigned to CHC I. Refined to bare essence, his argument rests on the notion that the prior convictions were improperly considered because Anderson neither had an attorney at the misdemeanor plea hearings nor knowingly and intelligently waived his right to counsel.

This argument runs headlong into a documentary obstacle: the state court records contain signed waivers of the right to counsel. Anderson attempts to confess and avoid. He concedes that he signed the waiver forms but maintains that he never understood the forms to waive his right to counsel (he regarded them merely as boilerplate needed to effectuate his pleas of nolo contendere).

Anderson advanced this construct in his objections to the PSI Report. The district court overruled the objections, stating:

> [Anderson] waived counsel. There's a written
> waiver in the record that he signed. There's
> been no evidence to convince me that he didn't
> understand what he was doing.

On that basis, the court concluded that the sentencing guidelines obliged it to take account of both the prior misdemeanor convictions and the consequent probationary term. USSG §§4A1.1, 4A1.2. It then assigned Anderson to CHC III, observing that, if anything, CHC III underrepresented the extent of Anderson's prior criminal activity. We discern no error.

We begin with the basics. In a federal criminal case, a defendant's CHC depends upon his criminal history score. See id. §4A1.1, cmt. Where, as here, the government establishes the existence of a prior conviction, the burden shifts to the defendant to establish that the conviction is constitutionally infirm or otherwise inappropriate for consideration. United States v. Gray, 177 F.3d 86, 89 (1st Cir. 1999); United States v. Unger, 915 F.2d 759, 761 (1st Cir. 1990). If the defendant fails to carry this burden, the sentencing court may then consider the prior conviction in compiling the defendant's criminal history score (and, ultimately, his CHC).

In this instance, the government established that Anderson had two prior misdemeanor convictions. For his part, Anderson tried to remove them from the equation by showing that he was deprived of counsel in violation of the Sixth Amendment. Anderson's argument is a non-starter: there is no constitutional right to counsel in a misdemeanor case in which the defendant is not sentenced to a term of immurement. See Scott v. Illinois, 440 U.S. 367, 373-74 (1979) (holding that the Sixth Amendment guarantees a right to counsel only if a misdemeanant ultimately is sentenced to a term of imprisonment). That point alone seems sufficient to derail Anderson's claim. After all, "an uncounseled misdemeanor conviction, valid under Scott because no prison term was imposed, is also valid when used to enhance punishment at a

-25-

subsequent conviction." <u>Nichols</u> v. <u>United States</u>, 511 U.S. 738, 749 (1994).[5]

We add, for the sake of completeness, that Anderson's claim has yet another shortcoming. Even assuming that he had a right to counsel during the misdemeanor proceedings, the district court found that he had knowingly and intelligently waived that right. The standard of review applicable to the district court's underlying factual finding — that Anderson understood the import of the waivers when he signed them — would be clear error. <u>Unger</u>, 915 F.2d at 762. In the circumstances of this case, it simply cannot be said that the district court clearly erred in making that determination.

The proof of the pudding is in the eating. Anderson acknowledges that he signed a waiver form with respect to each of the prior convictions. These forms plainly notified him of his

---

[5]Anderson might have had a right to counsel under Rhode Island law. <u>See</u> <u>Nichols</u>, 511 U.S. at 748 n.12 (noting that states are allowed to extend the right to counsel beyond the federal right, to, for example, all cases in which imprisonment is merely authorized by statute). We need not pursue that possibility for two reasons. First, Anderson makes no developed argumentation to that effect. Second, the Supreme Court has limited the circumstances in which a defendant can collaterally attack a state conviction, for federal sentencing purposes, to cases involving Sixth Amendment violations. <u>See</u> <u>Custis</u> v. <u>United States</u>, 511 U.S. 485, 487 (1994) (holding that a defendant in a federal sentencing procedure can collaterally attack prior state convictions only if those convictions were obtained in violation of the Sixth Amendment right to counsel); <u>see</u> <u>also</u> <u>United States</u> v. <u>Munoz</u>, 36 F.3d 1229, 1237 (1st Cir. 1994) (extending the <u>Custis</u> doctrine to cases arising under the federal sentencing guidelines).

right to consult an attorney of his own choosing or to have one appointed if he could not afford private representation. The language that appears directly above Anderson's signature on each form, in bold upper-case letters and partially underscored, is telling:

> **I HAVE READ AND REVIEWED THE ENTIRE CONTENTS OF THIS PAPER AND I HAVE NO QUESTIONS AS TO WHAT IT STATES AND MEANS AND I UNDERSTAND IT COMPLETELY. I WISH TO PROCEED WITHOUT A LAWYER REPRESENTING ME KNOWING THE ABOVE RIGHTS. I SWEAR TO THE TRUTH OF THE ABOVE**.

In an effort to counteract this powerful evidence, Anderson offers primarily his assertion that he misunderstood the purport of the proffered documents not once, but twice. The short answer to this plaint is that the district court found it incredible. That is not the stuff of clear error. A trial court is not bound to credit a defendant's self-serving statements. See Cuppett v. Duckworth, 8 F.3d 1132, 1139 (7th Cir. 1993) (explaining that "self-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions"); see generally United States v. Jimenez-Perez, 869 F.2d 9, 12 (1st Cir. 1989) ("It is . . . apodictic that a trier of fact is not bound to accept the self-serving stories of persons accused."); United States v. Cintolo, 818 F.2d 980, 989 (1st Cir. 1987) (similar). Here, as elsewhere, the court may draw reasonable inferences from the totality of the circumstances.

In a last-ditch effort to salvage this claim, Anderson notes that the transcript of his August 11, 1999 plea colloquy cannot be located. In a related vein, he points out that, when the state court judge asked him at the November 19, 1999 hearing whether he had any questions as to what was meant by signing the waiver form, his response was recorded as "inaudible." These facts are part of the totality of the circumstances — but in the end, Anderson adverts to nothing that affirmatively demonstrates the constitutional infirmity of the prior convictions. In the absence of such evidence, the district court was not obliged to draw inferences favorable to Anderson from either the wayward transcript or the inaudible response. See Parke v. Raley, 506 U.S. 20, 29-30 (1992) (deciding that reliance on the mere unavailability of a transcript does not surmount the "presumption of regularity" that attaches to a final judgment).

That ends this aspect of the matter. Credibility determinations at sentencing are within the exclusive province of the trial court. United States v. Sepulveda, 15 F.3d 1161, 1200 (1st Cir. 1993). Thus, we respect the sentencing court's decision not to credit Anderson's testimony that he misunderstood the clear and pointed language of the waiver forms. See United States v. Cruz-Alcala, 338 F.3d 1194, 1198 (10th Cir.) (deferring to a district court's credibility determination in a similar uncounseled misdemeanor case), cert. denied, 72 U.S.L.W. 3407 (Dec. 15, 2003).

On this record, the sentencing court did not err in finding that Anderson knowingly and intelligently waived his right to counsel.

This brings us full circle. The Sentencing Commission has gone to some lengths to explain that "[p]rior sentences, not otherwise excluded, are to be counted in the [defendant's] criminal history score, including uncounseled misdemeanor sentences where imprisonment was not imposed." USSG §4A1.2, cmt. (backg'd.). Anderson's prior convictions fit neatly within this integument, and we have determined that those prior convictions suffered from no cognizable constitutional defects. Consequently, the sentencing court's calculation of Anderson's criminal history score was proper. See Nichols, 511 U.S. at 749 ("[A]n uncounseled misdemeanor conviction, valid under Scott because no prison term was imposed, is also valid when used to enhance punishment at a subsequent conviction."). So too was its assignment of this defendant to CHC III.

## VI.  CONCLUSION

We need go no further. This was a horrific crime, demanding stern punishment. The district court took its task seriously and approached the matter of sentencing with care. Because nothing in the record so much as hints that the court committed reversible error in sentencing either of the appellants, we affirm the judgments below.

**Affirmed**.

-29-