# United States Court of Appeals
## For the First Circuit

Nos. 08-1220, 08-1221

UNITED STATES OF AMERICA,

Appellee,

v.

ELIEZER ROSA-CARINO,

Defendant, Appellant,

No. 08-1222

UNITED STATES OF AMERICA,

Appellee,

v.

SAMUEL DIAZ-DUMENIGO

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Jorge L. Gerena-Mendez for appellant Eliezer Rosa-Carino.
Laura Maldonado Rodríguez for appellant Samuel Diaz-Dumenigo.

Timothy R. Henwood, Assistant U.S. Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Chief, Appellate Division, and Luke Cass, Assistant U.S. Attorney, were on brief, for appellee.

_____

August 12, 2010

_____

**LYNCH**, **Chief Judge**.  The defendants, Eliezer Rosa-Carino and Samuel Diaz-Dumenigo, were convicted on four counts of participating in a large, international conspiracy to import by sea more than 5 kilograms of cocaine from nations in the Carribean, 21 U.S.C. §§ 841(a)(1), 846, 952(a), 963.  The conspiracy imported for distribution 415 kilograms of cocaine with a street value of over $6 million in 2005.  The district court sentenced Rosa to 235 months in prison and Diaz to 120 months in prison and each defendant to five years' supervised release and a $400 special assessment.

Diaz argues that there was insufficient evidence to convict him and that the district court erred by allowing expert testimony from a law enforcement officer on drug prices and how drug trafficking works.  Rosa appeals from his sentence, arguing that the court erred by denying his request for an offense-level reduction for playing a minor role in the conspiracy, that his sentence was unreasonably excessive, and that the court erred when it attributed 300 kilograms of cocaine to him when calculating his guidelines range.

We affirm.

## I.

Because Diaz challenges the sufficiency of the evidence against him and Rosa challenges the court's sentencing after the jury's verdict, we recite the facts in the light most favorable to

the verdict.  See United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008).

Diaz and Rosa were two of eighteen defendants charged with involvement in drug smuggling between August and November 2005 in Puerto Rico, the Virgin Islands (both United States and British), the Netherlands Antilles, Colombia, and the Dominican Republic.  The conspiracy came to the attention of federal authorities during an international investigation into the Carribean drug trade.  The investigation, code-named "Operation Watusi," led federal agents to obtain court orders under Title III to wiretap two phone numbers, both of which belonged to Toribio Jiménez-Guerrero, who organized efforts to import drugs into Puerto Rico.  Over forty-nine days, the government intercepted more than 700 calls involving about forty individuals.  Jiménez became one of the lead witnesses for the government.

The conspiracy made three drug shipments between August and November 2005.  On August 19, 2005, officers intercepted a boat carrying 88 kilograms of cocaine; it was supposed to land in Naguabo, Puerto Rico.  On November 4, 2005, the conspiracy successfully imported 27 kilograms of cocaine to Ceiba, Puerto Rico.  Some 300 kilograms of cocaine were shipped to Luquillo, Puerto Rico, and seized on November 17-18, 2005; the original date for the delivery had been November 12, but the shipment had been

delayed. Much of the evidence against Diaz and Rosa focused on their work for the Luquillo delivery.

The conspirators followed this basic plan for the Luquillo delivery. A boat carrying the drugs sailed from St. Maarten to St. Thomas[1] and then to a private beach in Luquillo, Puerto Rico. Several people were brought to meet the shipment at the Luquillo beach, unload the drugs onto a dinghy, bring the dinghy up a nearby river, and load the drugs onto a van. Jiménez and another person arranged to drive the van with the drugs to the San Juan metropolitan area.

Rosa provided access to the private beach. He also discussed delivery plans with Jiménez and tried to help Jiménez find a boat when the boat carrying the drugs to St. Thomas had trouble. Diaz drove the group that met the shipment at the Luquillo beach. Jiménez and his brother had asked Diaz, in person on November 10, 2005, to help them with a "movida"--slang for a movement of drugs--and Diaz had agreed.

On November 12, 2005, Diaz drove several conspirators in a white van to a street corner in Luquillo. He dropped them off, drove to a motel, and then waited to retrieve the men. However, the boat carrying the cocaine had trouble reaching St. Thomas, so the delivery was canceled. The wiretap captured phone calls

---

[1] The boat made an emergency stop in Tortola on the way to St. Thomas.

between Jiménez and Diaz in which they discussed the failed attempt and how Diaz should collect the others he had dropped off. It also captured Jiménez's call to Rosa the next day reporting the failure of the drug shipment to arrive.

On the night and early morning of November 16-17, 2005, the conspiracy again tried to deliver the drugs to the Luquillo beach. Diaz once more drove several others in a van. En route the group learned that federal agents were following them, and Diaz tried to stop the van. Prodded by the others, Diaz continued to Luquillo, dropped off his passengers, and waited for them at a motel.

The group went to the beach and waited for the boat. The boat approached the beach between 4:00 and 4:30 a.m. on November 17. But it had trouble reaching shore and soon capsized. The beach group rushed to collect bales of cocaine, which had scattered in the water, and load them onto the dinghy. Because the wiretap had tipped off law enforcement about the shipment, federal officers were monitoring the area and spotted the boat. When officers reached the beach, the conspirators ran, abandoning the drugs.

Diaz left the motel without retrieving his passengers. One passenger, José Jiménez-Guerrero (José), escaped from the police and called Diaz to pick him up. Diaz initially refused but agreed to call another conspirator and report that José was safe. José obtained a ride to a bus station, to which Diaz drove with

Jiménez to pick up José. Diaz gave José money to pay his driver. When José climbed in Diaz's car, Diaz noted that someone else had been arrested and commented, "I thought they had caught you." José, during the drive from the bus station and in front of Diaz, reported to Jiménez what happened on the beach.

On November 18, Jiménez learned from the news that agents had found only twelve bales of cocaine. Knowing the shipment contained fourteen, Jiménez called several people--including Rosa--to find out where the missing bales went. Officers listened to these calls on the wiretap and returned to the beach, on November 19, to look for the missing two bales. There they saw Rosa. After searching the beach, officers found another bale of cocaine. Altogether, officers recovered 300 kilograms from this shipment. Rosa and Diaz were later arrested.

A jury convicted Rosa and Diaz on four drug counts on September 14, 2007.[2] The district sentenced both defendants on January 9, 2008. The court denied Rosa's request for an offense-level reduction for playing a minor role in the conspiracy. The

---

[2] Those counts charged conspiracy to import narcotics into the customs territory of the United States, 21 U.S.C. §§ 952, 963; conspiracy to possess with the intent to distribute narcotics, 21 U.S.C. §§ 841, 846; importation of and aiding and abetting importation of narcotics into the customs territory of the United States, 18 U.S.C. § 2, 21 U.S.C. § 952; and possession with the intent to distribute and aiding and abetting possession with intent to distribute narcotics, 18 U.S.C. § 2, 21 U.S.C. § 841. The government dismissed a criminal forfeiture count, 21 U.S.C. §§ 853, 881.

court also rejected Rosa's argument that he should be held responsible for 2 kilograms, the amount Jiménez promised to pay him, rather than 300 kilograms, the amount actually shipped to Luquillo.

II.

A.      Samuel Diaz-Dumenigo's Claims

Diaz challenges the sufficiency of the evidence for his conviction and argues that the district court erred by permitting a law enforcement officer, Agent Eddie Vidal-Gil, to testify as an expert.

1.      Sufficiency of the Evidence

Diaz argues the evidence was insufficient because it did not show he had the requisite knowledge or intent for any of the drug charges. Diaz has conceded that he was responsible for driving the conspirators to and from the drug pickup site at Luquillo, Puerto Rico. But he argues that he believed he was transporting people to a paint job, that he did not know any drugs were involved, and that others hid that fact from him. His defense was ignorance and, so, innocence. To this he adds that he was merely present at the drug scene; that, he says, is not enough to uphold his convictions.

We review sufficiency-of-the-evidence claims de novo, taking the evidence and drawing all reasonable inferences in the light most favorable to the prosecution. United States v. Rosado-

-8-

Pérez, 605 F.3d 48, 52 (1st Cir. 2010).  The evidence supports the jury's assessment that Diaz had the requisite knowledge and intent.

Diaz testified in his own defense.  His implausible version of events was that he twice drove several conspirators to Luquillo from San Juan (some distance), in the middle of the night, for no money other than expenses.  He did not question why his passengers failed to do a paint job on the first night or why they had him wait at a motel, for hours, rather than at the purported paint-job site.  Nor could he remember most details of the two drives, including who he drove, where he went, where he stopped along the way, at what motel he stayed, and whether he picked anyone up in Luquillo after the November 17-18 raid.

Diaz's statements and actions, as established by other testimony and the wiretap recordings, were more consistent with his knowing participation in a drug delivery.  On November 10, when Jiménez invited Diaz to drive the van, Jiménez told Diaz that Jiménez was planning a "movida."  Jiménez testified that Diaz understood this term referred to a drug movement.

Diaz's phone conversations with Jiménez, captured on the wiretap, also supported Diaz knew he was involved in a drug movement.  For example, after the November 12 delivery was canceled, Diaz reported to Jiménez "no, they didn't move."  In these conversations Diaz used vague code words, supporting the

conclusion he was trying to conceal his participation in illegal drug activity. Diaz, tellingly, never mentioned paint.

José's testimony supported that Diaz knew that federal agents had tracked and intercepted an illegal drug shipment and that the passengers he had brought to Luquillo had later fled arrest. José testified that Diaz knew agents followed his van; that José called Diaz for help after the raid; that Diaz picked up José on November 18; and that Diaz, José, and Jiménez discussed the raid and its aftermath.

Diaz argues that no one explicitly told him the operation involved drugs; he points out that Jiménez admitted never saying so expressly when they met in person and that neither Diaz nor Jiménez mentioned drugs in their wiretapped phone conversations. But Jiménez testified that while he never spoke explicitly about drugs to Diaz, Diaz "should know" and "must know" that their conversations were about drugs. It is hardly surprising that drug conspirators never explicitly spelled out what they were doing in conversation. A reasonable jury could have concluded that Diaz knew and intended to participate in a drug delivery.

### 2. Officer Vidal-Gil's Testimony

Diaz argues the district court erred when it denied his motion to preclude Police Officer Eddie Vidal-Gil from testifying as an expert on the price of drugs and the nature of drug organizations. We review this preserved objection for abuse of

discretion. <u>United States</u> v. <u>Reynoso</u>, 336 F.3d 46, 49 (1st Cir. 2003).

As Diaz concedes, government officers may, depending on the facts, be qualified as experts on how drug organizations work and similar data. <u>E.g.</u>, <u>United States</u> v. <u>García-Morales</u>, 382 F.3d 12, 18-19 (1st Cir. 2004). But he argues the court should not have admitted this expert testimony for two reasons.

First, Diaz claims that Vidal's expert testimony about the nature of the conspiracy and, particularly, the street price of drugs was irrelevant and did not assist the jury. <u>See</u> Fed. R. Evid. 702 (permitting expert testimony that "will assist the trier of fact to understand the evidence or determine a fact at issue"); <u>García-Morales</u>, 382 F.3d at 18 ("[E]xpert testimony . . . must be relevant to the task at hand and helpful to the jury in its deliberations." (quoting <u>United States</u> v. <u>Lopez-Lopez</u>, 282 F.3d 1, 14 (1st Cir. 2002) (internal quotation marks omitted)). Second, he argues that testimony about the nature of drug organizations was cumulative because government cooperators had already described this organization in detail and so allowance of "expert" testimony, to boot, was unfairly prejudicial.

Both aspects of Vidal's testimony were relevant and helpful to the jury. The price of drugs helped the jury understand the vast amounts of money the conspirators could hope to make and the sheer volume of drugs involved. For example, Vidal testified

that a kilogram of cocaine was worth $16,000 on the street in Puerto Rico in 2005. The 300-kilogram delivery was therefore worth $4.8 million. The conspiracy's three attempted deliveries--of 88, 27, and 300 kilograms of cocaine--had a street value of $6.64 million. Drug smugglers handling such valuable drugs are unlikely to involve unknowledgeable outsiders.

Vidal's testimony was not cumulative; none of the other witnesses explained how drug conspiracies work generally and, in that context, how the government understood this particular conspiracy operated. Even if Vidal's testimony was cumulative, which it was not, Rule 403 gave the trial court wide discretion to determine whether testimony was <u>unfairly</u> prejudicial or <u>needlessly</u> cumulative. <u>See</u> Fed. R. Evid. 403; <u>see</u> <u>also</u> <u>United States</u> v. <u>Jimenez</u>, 507 F.3d 13, 18 (1st Cir. 2007). It did not abuse that discretion here.

B.     <u>Eliezer Rosa-Carino's Sentencing Claims</u>

Rosa argues that the district court erred by not granting him a two-level decrease in his offense level for playing a minor role in the conspiracy, by imposing an unreasonably high sentence, and by holding him responsible for an excessive amount of cocaine. We disagree.

1.     <u>Minor-Participant Adjustment</u>

The district court's decision whether to grant a downward adjustment for a minor role is usually a fact-based decision that

we review for clear error.  United States v. Sanchez, 354 F.3d 70, 74 (1st Cir. 2004).  Defendants seeking this adjustment have the burden to prove they are "(i) less culpable than most other participants in the offense of conviction, and (ii) less culpable than the average miscreant involved in offenses of the same genre." Id.  Rosa's presentence report recommended that he receive the adjustment.

The district court did not clearly err by concluding that Rosa was not less culpable than the other defendants or less culpable than most other drug conspirators.  The wiretap recordings and trial testimony supported the district court's assessment that Rosa was not at all on the periphery of this conspiracy.

Rosa did not simply provide private beach access as a drug landing point, as he suggests.  Jiménez repeatedly called Rosa to discuss the Luquillo delivery plans.  Rosa expected 2 kilograms as payment and demanded more if the shipment was larger; he also asked for another kilogram to sell himself, which was worth $16,000 on the street.  When the boat bringing the drugs to Luquillo initially had trouble in November, Jiménez turned to Rosa to help find another boat.  The fact that Rosa did not procure the boat on which the drugs were ultimately shipped is beside the point; the district court did not clearly err by considering his efforts to find a boat for Jiménez as evidence of Rosa's role in the conspiracy.  And after agents seized the 300-kilogram delivery,

Jiménez asked Rosa to explain why two bales were missing; Rosa later searched the beach for those bales.

The district court could easily conclude that Rosa was at least as involved as his co-defendants who worked with Jiménez and that his participation was similar to that of other drug conspirators.

### 2. Reasonableness of Rosa's Sentence

Absent an error in the district court's guidelines calculation or in the adequacy of its reasoning, we review a sentence's substantive reasonableness for abuse of discretion in light of all circumstances. United States v. Gibbons, 553 F.3d 40, 47 (1st Cir. 2009).

Rosa argues the district court did not properly consider mitigating sentencing factors recited in 18 U.S.C. § 3553(a). Although the court sentenced him to the bottom of his guidelines range, 235 months, he urges that the court should have sentenced him to the statutory mandatory minimum, 120 months.

The record flatly contradicts Rosa's argument that the court mechanically applied the guidelines without considering all the circumstances of his case. The court heard and articulated a number of facts favoring a lenient sentence but found they had to be balanced against the great harms done. Before sentencing Rosa, the court said it had considered the § 3553(a) factors, recited several mitigating facts, and sentenced Rosa to the bottom of his

guidelines range in light of those mitigating facts.  The district court did not abuse its discretion by concluding that a 235-month sentence fairly balanced these mitigating factors and the seriousness of Rosa's offense.

### 3.    Amount of Cocaine

The district court held Rosa responsible for 300 kilograms of cocaine, which was the amount recovered by authorities from the attempted delivery at Luquillo.  Rosa argues the court should have used the amount Rosa was promised in payment, 2 kilograms.

We review a sentencing court's calculation of drug quantities for clear error.  United States v. Platte, 577 F.3d 387, 391 (1st Cir. 2009).  To the extent Rosa argues that he could only be responsible for the amount he personally would receive, his claim misunderstands our caselaw.  He is also responsible for the amount of drugs he could have reasonably foreseen the conspiracy would involve.  United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004).

Wiretap recordings confirmed that Rosa had enough information that the Luquillo delivery would involve 300 kilograms; on one tape he was explicitly told it would be over 200 kilograms of cocaine.  Indeed, Rosa insisted that the 2 kilograms he was promised might not be enough if the overall delivery was much larger than 200 kilograms.  Rosa worked closely with Jiménez to

-15-

arrange the 300-kilogram shipment, and they had a number of phone calls about it.  After the seizure but during the conspiracy Rosa confirmed that he knew the delivery included 14 bales totaling about 300 kilograms.

III.

We <u>affirm</u> the judgment of the district court.