# United States Court of Appeals
## For the First Circuit

No. 23-1551

UNITED STATES OF AMERICA,

Appellee,

v.

RONALD ANDRUCHUK,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Rikelman, Selya, and Lynch,
Circuit Judges.

Amy Barsky, with whom Fick & Marx LLP was on brief, for appellant.
Lauren S. Zurier, Assistant United States Attorney, with whom Zachary A. Cunha, United States Attorney, was on brief, for appellee.

November 25, 2024

**SELYA**, **Circuit Judge**.  When a defendant knowingly and voluntarily waives his appellate rights in a plea agreement, we customarily enforce that waiver.  Here, however, defendant-appellant Ronald Andruchuk argues that the district court grossly erred in calculating the guidelines range and that this error overcomes the validity of his knowing and voluntary appellate waiver.  We reject that argument, uphold the waiver, and dismiss the defendant's related ineffective assistance of counsel claim as premature.

**I**

We start by rehearsing the background and travel of the case.  Because this appeal follows a guilty plea, we draw the facts from the plea agreement, the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing.  See United States v. Staveley, 43 F.4th 9, 11 (1st Cir. 2022).

Over a five-month span in 2021, the defendant purchased 169 firearms while struggling with a drug addiction.  During the course of this purchasing spree, the defendant falsely attested on required federal forms that he did not use illicit drugs.

The record reflects that the defendant shot his guns for sport at his home in Burrillville, Rhode Island.  But even though the defendant's home was equipped with a gun range, his neighbors complained that bullets sometimes flew dangerously close to their

houses (including bullets that ricocheted off of one neighbor's dwelling).

On February 24, 2022, Burrillville police officers responded to a neighbor's complaint and, while standing in the neighbor's driveway, witnessed bullets fly roughly four feet above their heads. The defendant was arrested that day for violating a state law that proscribed the firing of ammunition in a compact area. See R.I. Gen. Laws § 11-47-50.

Meanwhile, a federal investigation was gathering steam. The investigation had begun in the fall of 2021, when a federal agent noticed the large volume of Andruchuk's firearms purchases and became concerned that Andruchuk was involved in firearms trafficking. On the day of the defendant's arrest, federal agents searched his home pursuant to a warrant and found 219 unsecured firearms strewn about the premises, including several firearms capable of carrying more than fifteen rounds of ammunition. The search party also found gun paraphernalia and over 25,000 rounds of ammunition.

On March 23, 2022, a federal grand jury sitting in the District of Rhode Island charged the defendant with two counts of making a false statement during a firearms purchase, see 18 U.S.C. § 922(a)(6); two counts of making false statements on forms required to be kept by federal firearms licensees, see id. § 924(a)(1)(A); and one count of possession of a firearm by an

unlawful user of a controlled substance, see id. § 922(g)(3). On January 18, 2023, the defendant entered a guilty plea to the two counts of making a false statement during a firearms purchase and the single count of possession of a firearm by an unlawful user of a controlled substance. In exchange, the government agreed to dismiss the remaining charges, to recommend a sentence at the low end of the guideline sentencing range determined by the district court, and to recommend an acceptance-of-responsibility credit pursuant to USSG §3E1.1. As an integral part of this bargain, the defendant agreed to surrender his right "to appeal the conviction and sentences imposed by the Court, if the sentences imposed by the Court are within or below the sentencing guideline range determined by the Court."

The parties stipulated to certain facts regarding how many firearms were involved in the offenses of conviction. Otherwise, they made "no agreement as to which [o]ffense [l]evel . . . applie[d]" and reserved all rights to argue and present evidence on matters affecting the guideline calculations. Moreover, the defendant vouchsafed that he "underst[ood] that the Court alone makes all sentencing decisions, including the application of the guidelines."

At the change-of-plea hearing, the defendant assured the court that he had reviewed the plea agreement with his attorney and that he was fully satisfied with "the counsel, representation

and advice given to [him] by [his] attorney."  In turn, the court said that it would calculate the advisory sentencing guidelines and consider those guidelines, in conjunction with the statutory sentencing factors, to determine the defendant's sentence.  It explained that the defendant and his attorney would be able to review a draft PSI Report and "challenge any of the reported facts or the application of the guidelines recommended by the probation officer" before the report was put into its final form.

The district court went on to explain with conspicuous clarity:  "In your plea agreement, you agree that you will waive or give up your right to appeal the conviction and sentence imposed by this Court if the sentence is within or below the advisory sentencing guideline range determined by the Court."  The defendant confirmed that he understood the court's explanation.  The court then added:  "[T]ypically people have the right to appeal, right, but you're saying I give up or I waive my right to appeal my conviction and my sentence as long as my sentence is within or below that range."  The defendant again confirmed that he was changing his plea knowingly and voluntarily, that he understood the waiver, and that he had no remaining questions or concerns.

A probation officer prepared a draft PSI Report.  The defendant and his counsel reviewed the draft and lodged nine objections to it (all unrelated to the issues now on appeal).  Among other things, they clarified certain facts and objected to

a proposed four-level enhancement under USSG §2K2.1(b)(6)(B) for use or possession of a firearm in connection with another felony. The objection to the enhancement relied on commentary to section 2K2.1 of the guidelines. See USSG §2K2.1, cmt. n.14. The probation officer addressed every objection lodged by the defendant. The final version of the PSI Report incorporated all of the defendant's requested changes and omitted the challenged enhancement.

The guidelines prescribe a base offense level (BOL) of twenty when the offense of conviction involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." USSG §2K2.1(a)(4)(B)(i)(I). Accordingly, the final version of the PSI Report (to which the defendant did not object) set the defendant's BOL at twenty. In support, the PSI Report noted that — according to the case agent who saw the weapons seized — "there were several firearms capable of carrying more than 15 rounds of ammunition" amongst the 219 firearms seized and "[t]he offense involved semi-automatic firearms capable of accepting a large capacity magazine." Even so, the PSI Report did not contain any specific description of any magazine found in the house. Nor did the PSI Report mention Application Note 2 to section 2K2.1, which offers a more specific definition of a "semiautomatic firearm that is capable of accepting a large capacity magazine."

The district court convened the disposition hearing on April 17, 2023. Defense counsel confirmed that he had no outstanding objections to the final PSI Report. The court adopted the offense level calculations recommended in the PSI Report, which began with a BOL of twenty and reached a climax — after taking all adjustments into account — at level twenty-six. In conjunction with the defendant's placement in criminal history category I, this adjusted offense level yielded a guideline sentencing range of sixty-three to seventy-eight months' imprisonment. The court found this to be the applicable guideline sentencing range, and the defendant did not object either to this finding or to any of the court's other guideline calculations.

At sentencing, the government emphasized the sheer volume of firearms and ammunition and offered photographs depicting scores of guns and magazines of all kinds strewn about the defendant's house. The government also proffered a list of firearms and related paraphernalia seized from the defendant's house, which included 25,390 rounds of ammunition weighing over 1,500 pounds. But the government offered no evidence indicating that any specific magazine was capable of holding any specific number of rounds.

The district court sentenced the defendant to the low end of the guideline range that it had calculated: a sixty-three month term of immurement. It reminded the defendant that he had

- 7 -

waived his right to appeal a within-guideline sentence and that such waivers were "generally enforceable." In an abundance of caution, though, it explained that the defendant should speak to his attorney if he felt "that [his] guilty plea was somehow unlawful or involuntary or there's some other fundamental defect" or that his waiver was otherwise "not valid." As provided in the plea agreement, the district court dismissed the remaining charges.

This timely appeal followed.

## II

The defendant builds his appeal largely around an Application Note that was never cited in the proceedings below. See USSG §2K2.1, cmt. n.2. The guidelines prescribe a BOL of twenty where, as here, the offense of conviction involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." USSG §2K2.1(a)(4)(B)(i)(I). Application Note 2 (the Application Note) defines "semiautomatic firearm that is capable of accepting a large capacity magazine" as:

> a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

USSG §2K2.1, cmt. n.2.

At sentencing, nobody mentioned the Application Note —
not the government, not the defendant, not the probation officer,
and not the district court.  Thus, the government did not proffer
evidence and the district court did not find that any of the 219
firearms involved in the offense of conviction "had attached to
it" a magazine that could accept more than fifteen rounds.  Nor
was there a proffer, let alone a finding, that any such magazine
"was in close proximity" to any of the firearms.  The PSI Report
did, however, state that there were on the premises "several
firearms capable of carrying more than 15 rounds of ammunition."
Relatedly, the PSI Report confirmed that "[t]he offense involved
semi-automatic firearms capable of accepting a large capacity
magazine."  Far from objecting to these statements, the defendant
assured the district court that the facts upon which the PSI Report
rested were not in dispute.

The government's failure to adduce specific evidence of
any large capacity magazine attached to or in close proximity to
a firearm is the wellspring from which each of the defendant's
arguments flows.  None of these arguments was advanced below.

### III

Against this backdrop, we turn to the threshold issue of
whether the defendant's appeal is foreclosed by his appellate
waiver.  As a general matter, we have sanctioned the use of
appellate waivers in criminal cases.  See United States v. Teeter,

- 9 -

257 F.3d 14, 23 (1st Cir. 2001). Such waivers may facilitate plea-bargaining: "[a]llowing a criminal defendant to agree to a waiver of appeal gives her an additional bargaining chip in negotiations with the prosecution; she may, for example, be able to exchange this waiver for the government's assent to the dismissal of other charges." Id. at 22. Indeed, "in some cases the government, without such a waiver, might not be willing to plea-bargain at all." Id.

Even so, we have taken pains to erect sturdy guardrails around the use of appellate waivers in criminal cases. See Staveley, 43 F.4th at 13; Teeter, 257 F.3d at 23-26. A waiver of appeal must be knowing and voluntary. See Teeter, 257 F.3d at 24. And "if denying a right of appeal would work a miscarriage of justice, the appellate court, in its sound discretion, may refuse to honor the waiver." Id. at 25.

**A**

Our appraisal of whether an appellate waiver is knowing and voluntary occurs in two stages. First, we determine whether the plea agreement clearly sets forth the scope and terms of the waiver. See id. at 24. Second, we determine whether the sentencing court has paid particular heed to the waiver, specifically discussing with the defendant his understanding of the waiver provision and its ramifications. See Staveley, 43 F.4th at 14; Teeter, 257 F.3d at 24.

**1**

In the case at hand, the defendant first takes aim at the scope of his appeal waiver. He says that his appeal falls outside the waiver's scope. We think not.

The waiver in the defendant's plea agreement states: "Defendant hereby waives Defendant's right to appeal the conviction and sentences imposed by the Court, if the sentences imposed by the Court are within or below the sentencing guideline range determined by the Court." The defendant invites us to read this provision as "implicitly limited" to sentences "within or below the sentencing guideline range <u>correctly</u> determined by the Court" (emphasis supplied).

We decline the defendant's invitation. After all, the word "correctly" does not appear in the text of the waiver provision, and we must give the words actually used in a plea agreement their plain and ordinary meaning. See <u>United States</u> v. <u>O'farrill-López</u>, 991 F.3d 45, 48 (1st Cir. 2021). The waiver in this case is luminously clear: the defendant waives his right to appeal any sentence "within or below the sentencing guideline range determined by the Court." To add the word "correctly" to the parties' agreement, as the defendant suggests, would transmogrify the waiver's plain meaning and negate a portion of the benefit conferred on the government by the waiver. See <u>United States</u> v. <u>Edelen</u>, 539 F.3d 83, 85-86 (1st Cir. 2008) (noting that scope of

nearly identical waiver "could not be clearer"); United States v. Chandler, 534 F.3d 45, 49 (1st Cir. 2008) (holding that nearly identical waiver language was "broad enough to bar an appeal that challenges the application of the guidelines by the district court"). Without question, then, this appeal lies within the scope of the defendant's appeal waiver.[1]

**2**

Here, moreover, the waiver of appeal was knowing and voluntary. The record as a whole — including the colloquies at the change-of-plea hearing and at sentencing — makes manifest that the defendant knowingly and voluntarily waived his right to appeal any sentence that fell within the sentencing guideline range determined by the court. See United States v. Thompson, 62 F.4th 37, 42 (1st Cir. 2023); United States v. Villodas-Rosario, 901 F.3d 10, 15, 17-18 (1st Cir. 2018). Not only was the text of the appellate waiver clear, but the district court emphasized its meaning at the change-of-plea hearing. The court explained to the defendant, "[Y]ou agree that you will waive or give up your right to appeal the conviction and sentence imposed by this Court if the sentence is within or below the advisory sentencing guideline range

---

[1] Swimming against the tide, the defendant relies on a pre-Chandler case, United States v. McCoy, 508 F.3d 74 (1st Cir. 2007). His reliance is mislaid: McCoy's waiver applied to sentences "within the guideline range," not sentences within the "guideline range determined by the Court." Id. at 78 & n.4. This linguistic difference readily distinguishes McCoy from the case at hand.

- 12 -

determined by the Court." The defendant acknowledged that he understood what the court was telling him.

The short of it is that the defendant was well aware of what he was relinquishing when he took the benefit of the negotiated plea and waived his right of appeal. It follows that the appeal waiver was knowing and voluntary. See, e.g., Thompson, 62 F.4th at 39-42; Staveley, 43 F.4th at 14; Villodas-Rosario, 901 F.3d at 17-18.

**B**

This brings us to the defendant's principal argument: that holding him to the letter of his appeal waiver would work a miscarriage of justice. Invoking the miscarriage of justice exception to excuse a defendant from the rigors of a valid appeal waiver is contingent upon the defendant showing that some egregious sentencing error occurred after he executed the waiver. See Teeter, 257 F.3d at 25. The standard reflects that appellate waivers are not intended to "leave acquiescent defendants totally exposed to future vagaries (however harsh, unfair, or unforeseeable)." Id. Rather, such waivers are meant to "bring finality to proceedings conducted in the ordinary course." Id.

In keeping with the goal of promoting finality, we will not find a miscarriage of justice when a garden-variety error is unmasked. See United States v. Nguyen, 618 F.3d 72, 75 (1st Cir. 2010) ("Triggering the miscarriage of justice exception requires,

- 13 -

at a bare minimum, an increment of error more glaring than routine reversible error."). Were we to relax this standard, the exception would swallow the rule. We think it clear beyond hope of contradiction that should every reversible error constitute a miscarriage of justice, a waiver of appeal would be a dead letter. See Edelen, 539 F.3d at 87. Consequently, we apply the miscarriage of justice exception "sparingly and without undue generosity." Teeter, 257 F.3d at 26.

To determine whether enforcement of an appeal waiver would work a miscarriage of justice, we consider a litany of factors, such as the clarity of the error, its gravity and character, its impact on the defendant, the government's interest in enforcing the waiver, and the extent to which the defendant acquiesced in the result below. See id. Taking this approach, we have found a miscarriage of justice "when an error of significant or constitutional dimension is clear." United States v. Del Valle-Cruz, 785 F.3d 48, 56-57 (1st Cir. 2015) (finding miscarriage of justice when supervised release condition imposed without explanation prohibited parent from raising child); see United States v. Ortiz-Vega, 860 F.3d 20, 28 (1st Cir. 2017) (finding miscarriage of justice when district court refused to rule on defendant's constitutional claim alleging ineffective assistance of counsel); United States v. Santiago, 769 F.3d 1, 10-11 (1st Cir. 2014) (finding miscarriage of justice when district court

committed clear constitutional error by imposing part of sentence outside of defendant's presence).  We have also indicated that we would find a miscarriage of justice if a court used "'constitutionally impermissible factors (say, race or ethnicity)' at sentencing," if the court imposed "a 'sentence exceeding the maximum penalty permitted by law,'" or if the court imposed "a sentence that 'violate[d] a material term of the plea agreement.'" Villodas-Rosario, 901 F.3d at 19 (quoting Teeter, 257 F.3d at 25 nn.9-10).

With these benchmarks in place, we examine the defendant's claim of error.  He posits that a collective failure to notice and act upon the Application Note artificially boosted his guideline sentencing range and, thus, impermissibly elongated the length of his sentence.  If the Application Note had been correctly applied, he suggests, his offense level would have been much diminished and his guideline range would have been cut nearly in half.  In his view, this might have resulted in a sentence as low as thirty-seven months.

The defendant, however, does not proffer that his conduct fell short of meeting the criteria contained in the Application Note.  He complains only that the government did not set forth sufficient evidence to prove that his conduct satisfied those criteria.  We find that this alleged error does not translate into a miscarriage of justice.

To begin, the defendant's plaint rings hollow when considered in conjunction with his total acquiescence in the district court's findings of fact and guideline calculations. See Teeter, 257 F.3d at 26. The defendant conceded the accuracy of all of the facts presented at sentencing, including those contained in the final PSI Report. This means, of course, that he agreed that "[t]he offense involved semi-automatic firearms capable of accepting a large capacity magazine" including "several firearms capable of carrying more than 15 rounds of ammunition." The district court appropriately accepted those undisputed statements as its findings of fact. See United States v. Ramirez-Ayala, 101 F.4th 80, 87 (1st Cir. 2024) ("[A] sentencing court may accept any undisputed portion of the [PSI Report] as a finding of fact." (internal quotation marks omitted)); see also Fed. R. Crim. P. 32(i)(3)(A).

What is more, the defendant emphasized that "[t]he facts are really not in dispute" and, thus, "[t]he Court doesn't need to make any factfinding determinations." The defendant's total acquiescence robbed the government of any incentive to develop the factual record with greater particularity by, say, informing the court which of the many firearms involved in the offense satisfied the definition contained in the Application Note. Cf. United States v. Delgado-Sánchez, 849 F.3d 1, 6-7 (1st Cir. 2017) (explaining that "a powerful case for waiver" is presented when

- 16 -

defendant did not object at sentencing to conclusion in PSI Report because it "lulls the prosecution and the sentencing court into what will prove to be a false sense of security if he is later allowed to do an about-face" (quoting United States v. Turbides-Leonardo, 468 F.3d 34, 38 (1st Cir. 2006))).

Nor did the defendant take umbrage at any facet of the district court's guideline calculations. To the contrary, the defendant — like the government, defense counsel, and the probation office — agreed that the offense level was properly calculated. Cf. Sotirion v. United States, 617 F.3d 27, 38 (1st Cir. 2010) (finding no miscarriage of justice when "all of the parties involved, including the probation officer, the district judge, defense counsel, and the government, failed to realize that [a sentencing guideline] increase was inapplicable"). The defendant's suggestion that his prior counsel may have overlooked the Application Note is unsupported conjecture.

In all events, the record independently supports the inference that the Application Note was satisfied. Photographs introduced by the government display scores of firearms of all sorts strewn in piles next to ammunition. All in all, there were 219 firearms and over 25,000 rounds of ammunition. And the record remains devoid of so much as an assertion that — amongst all of that ammunition — there was no magazine capable of accepting more than fifteen rounds. We are left with no substantial reason to

doubt that the defendant qualified for the guideline range imputed to him — a circumstance that renders the impact of the asserted error wholly speculative. See Teeter, 257 F.3d at 26; see also O'farrill-López, 991 F.3d at 50 (finding no miscarriage of justice when "impact of the challenged action on [the defendant] is wholly conjectural").

To be sure, the defendant argues that the government never proved that this jumble of guns and ammunition contained a magazine capable of accepting more than fifteen rounds, either attached or in close proximity to a semiautomatic firearm. But under the circumstances of this case, the government's decision to rest on the PSI Report may well be a result of the defendant's stipulation to the facts. After all, the defendant's unconditional acquiescence in the government's version of the facts and the district court's guideline calculations left the government without incentive to identify a specific qualifying magazine. On this record, it is far from clear that the defendant did not possess a qualifying magazine. To sum up, we conclude that the district court — if it can be said to have erred at all — did not clearly err in calculating a BOL of twenty. See Thompson, 62 F.4th at 43; United States v. Rodriguez-Monserrate, 22 F.4th 35, 44 (1st Cir. 2021); see also Teeter, 257 F.3d at 26.[2]

_____

[2] The defendant also argues that the district court erred in not further reducing his BOL to six because he "possessed all

- 18 -

The facts agreed to by the defendant satisfy the requirement set forth in the plain text of the guidelines: that the offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." USSG §2K2.1(a)(4)(B)(i)(I). The unchallenged evidence before the court included photographs of scores of guns lying next to piles of ammunition and a description of the 219 guns and 1,500 pounds of ammunition seized. We discern no clear or obvious error in the district court's calculation of the guideline range.

To say more about this claim would be to paint the lily. We hold that enforcing the defendant's waiver of appeal will not work a miscarriage of justice.

**C**

We add a coda. The defendant is plowing barren soil in arguing that the principles elucidated in Rosales-Mireles v. United States, 585 U.S. 129 (2018), and applied in United States v. Romero, 896 F.3d 90 (1st Cir. 2018), assure his victory. In those cases, the sentencing courts had made plain errors — "that

ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition." USSG §2K2.1(b)(2). The defendant agrees that this sporting-purposes reduction would not apply if the BOL of twenty was properly calculated, and he does not argue that the failure to apply the reduction independently constitutes a miscarriage of justice. Because we conclude that the district court did not plainly err in applying the BOL of twenty, we need not reach the underlying issue.

- 19 -

is to say, clear or obvious" errors — in their challenged guideline calculations.  Rosales-Mireles, 585 U.S. at 135 (double-counting a single conviction in determining defendant's criminal history score); see Romero, 896 F.3d at 92 (considering all prior convictions for enhancement when only those that receive criminal history points should be considered).  Had there been plain error here, this case might tell a different tale.  See Teeter, 257 F.3d at 25 (noting that plain error in sentencing is subset of miscarriage of justice exception).

Here, however, the absence of any showing of clear or obvious error defeats any claim of plain error.[3]  See United States v. Olano, 507 U.S. 725, 734 (1993); United States v. Sansone, 90 F.4th 1, 8 (1st Cir. 2024).  In the end, the defendant must honor the waiver of appeal provision to which he subscribed.

**IV**

The defendant argues — also for the first time — that he received ineffective assistance of counsel below.  He claims that

---

[3] The parties discuss at some length the relationship between the miscarriage of justice standard and the plain error standard. We agree that the miscarriage of justice analysis resembles the plain error analysis in the context of sentencing guideline disputes. See, e.g., United States v. Rodriguez-Monserrate, 22 F.4th 35, 46 (1st Cir. 2021) ("Because we have suggested that plain sentencing error is 'a subset' of the miscarriage-of-justice exception, we use the two standards interchangeably in this analysis." (quoting Teeter, 257 F.3d at 25)).  But because this case does not require us to explicate the precise relationship between the two standards, we leave that question for another day.

his counsel was ineffective for failing to raise the issue of the Application Note. In his view, this ineffective assistance is both an independent ground for relief and constitutes a miscarriage of justice under Teeter. We cannot consider either argument on the record before us.

Although the Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, see Scarpa v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994), a defendant lacks an absolute right to bring such a claim for the first time on direct review of a conviction or sentence, see Staveley, 43 F.4th at 15. "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court."[4] United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993). "This so-called Mala rule is a 'prudential precept' based on practical realities." Staveley, 43 F.4th at 15 (quoting United States v. Padilla-Galarza, 990 F.3d 60, 93 (1st Cir. 2021)).

To demonstrate ineffective assistance of counsel, a defendant must make fact-specific showings that "counsel's

_____

[4] To be sure, there is an exception to this rule "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of an ineffective assistance claim." United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). The case at hand does not fit within the narrow confines of this exception.

performance was constitutionally deficient" and "that the deficient performance prejudiced the defense." Mala, 7 F.3d at 1063 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Those showings "typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal." Id.

This case aptly illustrates why we require claims of ineffective assistance to be developed before the trial court. For one thing, "the record is tenebrous as to whether counsel's performance was constitutionally deficient." Staveley, 43 F.4th at 16. We know nothing about the thinking behind counsel's approach, so we cannot begin to make a reasoned decision about the adequacy of his performance. For another thing, there is no evidence that counsel's purported deficiencies prejudiced the defense. The defendant has not alleged that the district court erred in assigning him a BOL of twenty, much less provided evidence to that effect. See id. This case falls squarely within the Mala rule.

Where, as here, an ineffective assistance claim is based on an undeveloped record, a piggyback claim that the ineffective assistance caused a miscarriage of justice necessarily fails. See Staveley, 43 F.4th at 17-18. To constitute a miscarriage of justice, there ordinarily must — at a minimum — be some clear error. But "the clarity of an alleged error — or its lack of

clarity — is revealed only by measuring the appellant's argument against the record." Id. at 18. When we lack a record by which to measure the purported deficiency of counsel, "there is no reliable way for us to tell whether and to what extent an appellant's claim of unfairness is woven entirely out of strands of speculation and surmise." Id.; see United States v. Torres-Estrada, 817 F.3d 376, 379 (1st Cir. 2016) (refusing to find miscarriage of justice based on ineffective assistance of counsel claim "because even if we did not enforce the waiver of appeal clause, we would decline to hear [the defendant]'s claims on direct appeal"). Although ineffective assistance of counsel can provide the basis for a miscarriage of justice exception, see Ortiz-Vega, 860 F.3d at 28, it can do so only if we are equipped to "review these allegations of ineffective assistance in a manner sufficient to assess the enforceability of the defendant's waiver," Staveley, 43 F.4th at 16. Here, we are not so equipped.

## V

We need go no further. For the reasons elucidated above, we dismiss the appeal; without prejudice, however, to the defendant's right to bring, should he so elect, his ineffective assistance of counsel claim in a collateral proceeding under 28 U.S.C. § 2255.

**Dismissed**.